ROBERT D. FORRESTER, Trustee, Plaintiff-Appellee and Cross-Appellant, *v.* STATE BANK OF EAST MOLINE, Defendant-Appellant and Cross-Appellee.

Third District   No. 76-472

Opinion filed May 25, 1977.—Rehearing denied July 1, 1977.

Gerald D. Mindell and Robert H. Wheeler, both of Isham, Lincoln & Beale, of Chicago, and Barash & Stoerzbach, of Galesburg, and Lytton & Dalton, of East Moline, for State Bank of East Moline.

John J. Coffey, III, and Joseph P. Della Maria, Jr., both of Rothschild, Barry & Myers, of Chicago, and Robert J. Noe and James D. Mower, both of Bozeman, Neighbour, Patton & Noe, of Moline, for Robert D. Forrester.

Mr. PRESIDING JUSTICE ALLOY delivered the opinion of the court:
The State Bank of East Moline, hereinafter called "State Bank," appeals from a judgment of the Circuit Court of Rock Island County in favor of Robert D. Forrester as trustee of the bankruptcy estate of James Louis Heller. The action was brought in the circuit court to recover damages incurred by reason of fraudulent representations or, alternatively,

negligent misrepresentations, of the defendant State Bank. The jury trial resulted in a verdict for the plaintiff Forrester, as Trustee, on the ground of fraudulent misrepresentations.

Defendant State Bank argues (1) that plaintiff failed to properly plead and prove the necessary elements for recovery on the basis of fraud or misrepresentation; (2) that the trial court failed to apply correctly the Uniform Commercial Code (Ill. Rev. Stat. 1975, ch. 26, par. 1—101, *et seq.*) in denying defendant's motion for directed verdict and post-trial motion on the basis of the facts in the case; (3) that the trial court erred in allowing plaintiff's post-trial motion for additur of statutory interest; and (4) that the trial court erred in allowing the jury to consider as an element of damages, interest paid by plaintiff on a loan made by him for the purchase of cattle.

There is also a cross-appeal by plaintiff Forrester from the action of the trial court in reducing the amount of statutory interest, which was awarded to plaintiff, by the amount of out-of-pocket interest which was paid by plaintiff and which amount is included in the judgment for plaintiff returned by the jury.

As we have noted, Forrester is the trustee of the bankruptcy estate of James Louis Heller. The action was originally brought by Heller, but after his bankruptcy, during the pendancy of this litigation, plaintiff Forrester succeeded to the position of Heller in the action. The defendant State Bank was involved in financing certain cattle feeding operations of Western Testing, Inc. Western Testing also was bankrupt in 1967, and is not a party to the action. The instant action was brought to recover certain losses sustained by Heller as a result of the purchase of 1,063 head of feeder cattle from Western Testing. Heller paid $150,504 for the cattle, and borrowed the total sum for such purchase from First National Bank of Peoria.

Following the purchase, Heller left the cattle at the Western Testing feed lots in Orion, Illinois, to be fattened. About 45 days after Heller bought the cattle, Western Testing went bankrupt, with a total of 7,592 head of cattle on the Western Testing feed lots at Orion, Illinois, and St. Joseph, Missouri. Claims of ownership to cattle amounted to a total of 15,189 head of cattle. Reclamation petitions were filed by Heller and other claimants, including defendant State Bank. Heller ultimately received $68,111.13 pursuant to a plan of settlement and distribution of the bankrupt's (Western Testing's) assets, which plan was initially proposed by the defendant State Bank. Heller repaid his loan of $150,504 principal plus $21,221.13 in interest to the First National Bank of Peoria and, also, incurred attorney's fees of $7,761.63 in prosecuting his claim in bankruptcy, thus sustaining a loss from these items of $111,375.63 on the transaction with Western Testing.

Plaintiff's amended complaint stated two counts for recovery against the defendant State Bank. Count I alleged that the defendant, through its employee William McKelvey, knowingly and falsely represented to Heller that Western Testing was the owner of the cattle to be purchased by Heller; that it was safe to buy the cattle; and that Heller would receive clear title to the cattle. Count II of the complaint, based on negligent misrepresentation, alleged that defendant bank was involved in financing certain cattle clubs with Western Testing; that defendant had or should have had knowledge concerning the operation of Western Testing; and that defendant negligently failed to ascertain the ability of Western Testing to transfer title and ascertain the number of cattle on Western Testing's premises; and to compare the number of cattle club investors and the number of cattle allegedly owned by each with the number of cattle physically situated on Western Testing's premises. Defendant State Bank challenged this complaint by filing a motion to dismiss for failure to state a cause of action. The trial court denied the motion.

In the jury trial, plaintiff Forrester called six witnesses, three of them being officers of defendant State Bank, who were called as adverse witnesses. The defendant State Bank called two witnesses. The evidence at the trial showed that Western Testing Company, a cattle feeding operation, employed a technique whereby outside investors could invest in cattle feeding operations through "cattle clubs." It was shown that Western Testing would finance an individual purchase of feeder cattle through defendant State Bank, with Western Testing signing a note and a security agreement giving State Bank a security interest in the cattle purchase. Western Testing would then sell the cattle to investors, often grouped into clubs, and frequently Western Testing would enter into Cattle Feeding Agreements with the investors to provide for feeding of the cattle for approximately 200 days it took to fatten them for market. Prospective investors would sometimes be able to borrow the total cost of acquiring the cattle plus the cost of feeding the cattle until fattened. Apparently defendant State Bank at times financed sales of the cattle to the investors, taking a security interest in the cattle which the investors acquired. From 1965 to 1967 the Western Testing account at defendant State Bank was handled by William McKelvey.

During 1967, Heller, who had been in the cattle business for over 40 years, was employed by Buster and Company, a brokerage firm which purchased cattle for resale to packers for slaughter. Prior to May 21, 1967, Heller had become acquainted with Edgar McWhinney, the owner and operator of Western Testing, through Heller's activity in making of cattle purchases from McWhinney on the Buster and Company account. It also appears that prior to May 21, Heller had purchased feeder cattle from time to time for his own account, both from McWhinney and from others.

On about May 21, 1967, McWhinney offered to sell some Hereford heifers to Heller personally, and if Heller so desired, to fatten the cattle at the Orion, Illinois, feed lot for later resale for slaughter.

Before agreeing to purchase the cattle, Heller contacted defendant State Bank, since Heller knew the bank to be Western Testing's banker and, also knew that the bank held a security interest on the offered cattle. He talked to McKelvey, as a representative of the bank. At the trial, Heller testified that he told McKelvey that he would be required to borrow the money to make the purchase and that he wanted to know from McKelvey whether Western Testing owned the cattle, whether it was safe to buy them, whether he would get clear title to the cattle, and whether defendant State Bank would release its security interest in the cattle. According to Heller's testimony, McKelvey replied affirmatively to all these inquiries. Heller also testified that he told McKelvey that the cattle would be left at the Orion, Illinois, feed lot for feeding. Heller admitted on cross-examination that he, Heller, had said that he could have moved the feeder cattle from the Orion lot if he wanted to. McKelvey's testimony at trial admitted the telephone conversation with Heller. McKelvey, however, testified that he told Heller that the purchase was unobjectionable to defendant State Bank so long as the bank received the proceeds from the sale, and McKelvey denied ever telling Heller that it would be safe to buy the cattle, that Western Testing owned the cattle, or that Heller would receive clear title to the cattle.

On May 22, 1967, Heller met McWhinney at the Orion, Illinois, feed lot, and the cattle to be purchased by Heller were counted and weighed. Heller prepared a draft payable to Western Testing and defendant State Bank and delivered the draft to McKelvey at the Orion feed lot. Heller was given a bill of sale covering 1,063 head of cattle. At that time, Heller requested McKelvey to write to Heller's bank and, also, to release defendant State Bank's mortgage on the cattle. McKelvey stated that he would release State Bank's mortgage on the cattle. Defendant State Bank apparently had a mortgage on all cattle owned by Western Testing.

McKelvey subsequently prepared debit tickets and applied the proceeds of Heller's draft to satisfy three Western Testing notes. The security agreements which corresponded to these notes referred to 590 head of cattle. Additional proceeds of Heller's draft were applied to satisfy a note executed by Scott McWhinney, Edgar McWhinney's son. This loan had been made as an accommodation to Western Testing, since Western Testing would have been over its loan limit with the State Bank, had the loan been made directly to Western Testing. The proceeds of the loan had been credited to Western Testing's account. To provide security for the loan, Western Testing had sold 925 head of cattle to Scott McWhinney, and he had pledged these cattle as security for the loan. On

May 26, McKelvey wrote a letter to Heller's bank, which stated that defendant State Bank recognized the sale of 1,063 head of cattle to Heller and released its mortgage on those cattle.

On July 28, 1967, Western Testing went into bankruptcy. At that time, Western Testing had 7,592 head of cattle on its feed lots. As we have noted, reclamation petitions were filed for 15,189 head of cattle, including a petition filed by State Bank for 5,100 head. The trustee in bankruptcy ordered that the cattle be sold in order to avoid the cost of keeping the cattle. Subsequently a plan of settlement and distribution proposed by defendant State Bank was adopted, and Heller received $68,111.13 from the bankrupt estate of Western Testing. Heller paid his bank the sum of $150,504 principal and $21,211.13 interest on his loan, and, also, paid his attorneys $7,761.63 for their work in the Western Testing bankruptcy proceedings.

After presentation of all the evidence, the jury in this cause returned a verdict on the ground of fraudulent misrepresentation in favor of plaintiff in the sum of $111,500. No verdict was returned on the negligent misrepresentation count of plaintiff's complaint. Defendant State Bank filed a post-trial motion and plaintiff filed a motion to amend the judgment by adding statutory interest. The trial court denied most of defendant's post-trial motion, but did order a remittitur of $124.37. The court granted the plaintiff's motion to amend the judgment by adding statutory interest of $33,735.24, but ordered the statutory interest reduced by $21,221.13 (the out-of-pocket interest expense paid by Heller to his bank). The trial court thereupon entered judgment in the amount of $123,889.74 in favor of plaintiff on July 28, 1976.

On appeal in this court, defendant first argues that plaintiff failed to sufficiently plead and prove fraud and deceit by defendant State Bank, and that, therefore, the trial court erred in refusing to grant defendant's motion to dismiss the complaint and, also, in denying defendant's motion for a directed verdict as well as denying defendant's post-trial motion for a judgment *n.o.v.*

■■ As noted in the case of *Davis v. Neff* (1st Dist. 1973), 14 Ill. App. 3d 318, 325, 302 N.E.2d 382:

> "In order to establish fraud it must be alleged and proved that the statement made was of a material fact and not opinion; it must be untrue; the party making the statement must know or believe it to be untrue; the person to whom the statement is made must believe and rely on it, and have a right to do so; it must have been made for the purpose of inducing the other party to act; and the reliance by the person to whom the statement is made must lead to his injury. *Broberg v. Mann*, 66 Ill. App. 2d 134, 213 N.E.2d 89."

In the instant case, the complaint of plaintiff alleged that defendant

"falsely represented to the plaintiff that Western Testing, Inc., was the owner of said cattle [to be sold to Heller], that it was safe to buy them and that he would receive clear title thereto." Defendant argues that the alleged misrepresentations are matters of opinion and predictions of future events, and, therefore, not actionable. The supreme court of this State, however, in *Buttitta v. Lawrence* (1931), 346 Ill. 164, 172-73, 178 N.E. 390, states:

> "Whether language used is a matter of opinion or a positive averment of fact depends largely upon the facts of each case. Wherever a party states a matter which might otherwise be only an opinion but does not state it as the expression of the opinion of his own but as an affirmative fact material to the transaction, so that the other party may reasonably treat it as a fact and rely upon it as such, then the statement clearly becomes an affirmation of the fact within the meaning of the rule against fraudulent misrepresentation. Statements of value are common examples, and where made in pursuance of a scheme on the part of the defendant to induce plaintiff to trade with him such statements constitute fraud and deceit."

While statements alleged in this complaint may not in all situations constitute statements of a material fact, in the factual context of this case, the complaint sufficiently alleges misrepresentations of material facts, as opposed to opinion. Plaintiff's complaint contained other requisite allegations for a fraudulent misrepresentation. We conclude, therefore, that the trial court properly denied defendant's motion to dismiss the complaint and motions for directed verdict as well as the post-trial motion for judgment *n.o.v.*

■■ Defendant additionally argues that the proof adduced at the trial failed to establish fraudulent misrepresentation by defendant, and that the trial court erred in not granting the motions for a directed verdict and for judgment *n.o.v.* As stated in *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504:

> "* * * verdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand."

The evidence at the trial established that defendant State Bank was closely involved with the financing of Western Testing's feed lot operation. It appears that McKelvey, an officer of defendant, made periodic trips to Western Testing's feed lot at Orion, Illinois, and was familiar with the physical facilities of the feed lot. Defendant was aware that in December 1966, McWhinney had sold mortgaged cattle without

paying off the mortgage. Western Testing's account with defendant was frequently in an overdraft status, and on May 15, 1967, defendant informed McWhinney that he would have to stop writing checks on uncollected funds. Defendant State Bank held a security interest in all the cattle owned by Western Testing and also security interests in some cattle owned by investors but held for feeding at the feed lot. As a consequence, the jury could properly conclude that Heller's inquiries on May 21, 1967, and the defendant-bank's replies, through its officer, concerned matters of material fact relating to Heller's purchase other than matters of opinion. While Heller may have obtained clear title to the cattle, and the transaction had been safe for Heller if he had removed the cattle from the Orion feed lot on the date of purchase, the jury obviously determined that defendant knew that Heller would not remove the cattle prior to feeding out, and that the representations by defendant to Heller were made in light of this knowledge. The consequences of Western Testing's subsequent bankruptcy and the developments attendant therewith, disclosed that the representations were untrue. Due to defendant's extensive knowledge of Western Testing's finances, Heller could have been justified in relying on defendant's representations. We, therefore, conclude that we cannot state that the evidence so overwhelmingly favors defendant that no contrary verdict could stand. We find the trial court properly denied defendant's motions for directed verdict and for judgment *n.o.v.*

■■ Defendant also argues that the judgment for plaintiff cannot stand because it is clear that under the Uniform Commercial Code plaintiff took title to the cattle. Defendant cites section 2—403(2) of the Uniform Commercial Code (Ill. Rev. Stat. 1975, ch. 26, par. 2—403(2)), which states:

> "Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him the power to transfer all rights of the entruster to a buyer in the ordinary course of business."

Defendant argues that under this provision, Heller took title to the cattle at the time of the sale notwithstanding other claims of ownership, and that his action for misrepresentation is thereby precluded. It appears, however, that defendant at the time of the making of the representations was aware that Heller intended to leave the cattle at Western Testing's feed lot for feeding. Thus, the alleged actionable representations pertain not merely to the instant of the sale to Heller, but also to the subsequent period of feeding out, and the entrusting provision of the Uniform Commercial Code does not, as a matter of law, preclude plaintiff's action.

■■ Defendant likewise contends that the trial court erred in allowing the jury to consider as an element of damage, evidence that Heller paid

$21,221.13 to his bank as interest on the loan made to purchase the cattle and $7,761.63 to his attorneys as fees for representation in the Western Testing bankruptcy proceedings. We do not believe this contention is sound. In *Fairfield Savings & Loan Association v. Kroll* (1st Dist. 1969), 106 Ill. App. 2d 296, 306, 246 N.E.2d 327, the court states:

> "The measure of damages which results from fraud of a defendant should not be the gain received by defendant, but rather the injury to plaintiff (Lickus v. O'Donnell, 321 Ill. App. 144, 147-8, 52 N.E.2d 271; Horne v. Walton, 117 Ill. 141, 145, 7 N.E. 103)."

At the trial, the evidence indicated that prior to making the alleged misrepresentations to Heller, defendant was informed by Heller that he would borrow funds to purchase the cattle. This interest expense, as well as attorney's fees, resulted in injury to Heller, as can be seen by comparing the cattle transaction as it occurred (with defendant's misrepresentation) and the transaction as it might have occurred had the defendant's representations been true. We conclude, therefore, that the trial court properly allowed the jury to consider evidence of Heller's interest expense and the attorney's fees as elements of damage as a result of fraudulent misrepresentations of defendant.

The final argument made by defendant relates to the trial court's award of statutory interest under section 2 of "An Act in relation to * * * interest * * *" (Ill. Rev. Stat. 1975, ch. 74, par. 2). The trial court granted plaintiff statutory interest from May 22, 1967, the time of the transaction and until the date of entry of the original judgment in this cause, which interest totaled $33,126. The trial court, however, offset against this statutory interest, $21,221.13, the amount of interest expense included in the original judgment, and allowed plaintiff an additur of $12,514.11.

■■ On the interest issue, it is notable that in *Kramlich v. Home Federal Savings & Loan Association* (1st Dist. 1974), 26 Ill. App. 3d 430, 438, 325 N.E.2d 657, the court said:

> "At common law, interest could not be recovered in the absence of an agreement to pay it. [Citation.] However, legislation has been enacted to provide for the collection of prejudgment interest in certain cases."

Section 2 of "An Act in relation to * * * interest * * *" (Ill. Rev. Stat. 1975, ch. 74, par. 2) has been held to allow interest on a judgment for fraud. In *Pfeffer v. Farmers State Bank* (1st Dist. 1931), 263 Ill. App. 360, plaintiff had purchased a building on which the defendant bank held a mortgage. The defendant bank was in possession of an insurance policy on the property, and plaintiff attempted to obtain the policy in order to procure the insurance company's consent to assignment of the policy. The bank refused to give the policy to the plaintiff, and later told the plaintiff that the insurance company's consent had been obtained. Subsequently,

when the building burned, it appeared that defendant bank had not obtained the insurance company's consent, and the insurance company refused to pay for the loss. Plaintiff obtained a judgment against defendant bank on the ground of fraud. In sustaining the trial court's grant of statutory interest on the judgment, the appellate court stated:

> "Finally, defendant contends that the court erred in allowing plaintiff to recover interest and cites section 2, chapter 74 of the revised statute * * *; that defendant has defended this suit in the utmost good faith, and that it is not guilty of vexatious delay of payment. We do not think the trial court allowed interest upon that theory. While this action is in form in tort, the damages disclosed are liquidated and easily ascertainable. For that reason the interest was properly allowed. (*Schwitters v. Springer*, 236 Ill. 271; *Laughlin v. Hopkinson*, 292 Ill. 80; *Genslinger v. New Illinois Athletic Club*, 252 Ill. App. 298.)" (263 Ill. App. 360, 373.)

Similarly, the damages suffered by plaintiff in this cause are liquidated and easily ascertainable, and the trial court did not err in awarding statutory interest. Defendant argues that the interest should run only from the date this suit was initiated, rather than from the date of the cattle transaction. The interest award, however, is not made on the theory of defendant's delay in payment, and we conclude that the award of interest from the date of the transaction is proper on the basis of the record in this cause.

■■ On cross-appeal, plaintiff contends that the trial court erred in offsetting against the statutory interest, the amount of Heller's out-of-pocket interest expense which was included in the jury's verdict. The interest on Heller's loan was clearly damage suffered as a result of the State Bank misrepresentations, and was a liquidated and easily ascertainable amount. The award of statutory interest is a completely different remedial device from the interest expense included, resulting from out-of-pocket payments by Heller which was included in the judgment. We conclude that the statutory interest should not have been offset as against the interest expense awarded in the jury's verdict.

For the reasons stated, therefore, the judgment of the Circuit Court of Rock Island County is affirmed in part and reversed in part, and this cause is remanded with direction to the circuit court to enter an amended judgment allowing the statutory interest, with no offset for interest expense included in the jury's verdict.

Affirmed in part and reversed and remanded in part.

SCOTT and BARRY, JJ., concur.