TIMOTHY F. MURPHY, Plaintiff-Appellee, *v.* CHRISTIAN WALTERS *et al.*, Defendants-Appellants.

Second District   No. 79-7

Opinion filed August 4, 1980.—Rehearing denied September 9, 1980.

Jack Zuideveld, of Oak Park, for appellants.

Cornelius P. Callahan, of Lord, Bissell & Brook, of Chicago, for appellee.

Mr. JUSTICE UNVERZAGT delivered the opinion of the court:

The plaintiff sued Christian Walters and Jack Zuideveld and the Christian Audio Visual Corporation in three counts. Count I alleged fraudulent representations by Zuideveld and Walters; count II alleged the same by Christian Audio Visual Corporation and count III was against all three based on the Illinois Securities Law of 1953, section 1 *et seq.* (Ill. Rev. Stat. 1977, ch. 121½, par. 137.1 *et seq.*) and particularly section 12, subparagraphs A, F, G and I thereof.

This appeal is from a judgment against Zuideveld under count I in the amount of $25,000, plus the right to receive 2 percent of the stock of Christian Audio Visual Corporation and for $20,000 under count III, plus $7,500 attorney fees and costs. Only Jack Zuideveld prosecutes this appeal. It should be noted that there was no judgment rendered against Christian Audio Visual Corporation, that corporation being in bankruptcy at the time of the trial.

The defendants, Zuideveld and Walters, are the incorporators and owners of the majority of the stock of Christian Audio Visual Corporation (hereinafter referred to as "CAV") which produces such publications as "The Spoken Bible," "The Spoken Proverbs," and "The Spoken Psalms." It is also a distributor of electronic equipment and a member of the Christian Booksellers Association. In June of 1977, the plaintiff responded to an advertisement in the Chicago Tribune offering a position as advertising manager for CAV corporation. The plaintiff met with Zuideveld and Walters and engaged in several negotiating sessions with them regarding the position. Before signing a contract of employment with CAV, the plaintiff had for eight years been advertising manager of a corporation in Hinsdale at a salary of $23,000 per year plus performance bonuses. He alleged he was still so employed when he answered the CAV advertisement. The job was advertised as a "business opportunity" for a person with a background in advertising and catalogue production. After several meetings with Zuideveld and Walters, the plaintiff signed a contract of employment with CAV which provided that (a) Murphy would invest $10,000 in the corporation—$5,000 in cash and $5,000 in two notes for $2,500 each payable in 12 months, in return for which he would receive 2 percent of the common stock and (b) Murphy would be hired as advertising manager for CAV for five years at a beginning salary of $25,000 per year with a 10% bonus each year thereafter, plus fringe benefits such as life insurance and vacations. The contract spelled out in some detail what his duties would be, suggesting an actual employment

contract, not just an investment scheme. The contract was between CAV corporation and Murphy, the plaintiff, although it was signed on CAV's behalf by Zuideveld as secretary of the corporation. Murphy was given at the time of his employment a typed sheet entitled "Financial Projection", apparently prepared by Zuideveld and Walters, which projected a prosperous future for CAV and indicated the stock would be a good investment. This projection was based on past and estimated future sales.

The plaintiff commenced working for CAV on July 6, 1977. The agreed salary of a little over $2,000 per month was paid for July but the August salary was not paid in full—Murphy received only $1,500 at the end of August. He was promised the $500 balance for his August salary would be paid in September. Apparently at this time the corporation was in some financial difficulty and, on September 28, Murphy was still $500 short on his August salary. It is alleged by the defendant that on September 28, Murphy went to the Illinois Department of Labor and made a claim for unemployment compensation, stating that he had not been paid in accordance with his employment contract. A memo from the Illinois Department of Labor purportedly sustaining this allegation was offered in evidence, but objection to it was sustained and the memo is not before us. In any event, Murphy did not work for CAV after September 30, and the suit before us was filed on October 4, 1977, as well as a temporary restraining order against the defendants prohibiting them from disposing of any assets of the corporation without the approval of the court. In January of 1978, the corporation filed for bankruptcy and according to Zuideveld was being operated under chapter XI at the time of the trial.

After initial answer to the complaint, the defendants' attorney withdrew as counsel and Zuideveld and Walters acted *pro se* at the trial. After hearing extensive testimony and considering the briefs and arguments on both sides, the trial court on April 17, 1978, gave judgment for the defendants, holding that (1) the evidence did not support the contention that the defendants acted "outside their corporate existence," (2) that the contention that the plaintiff should have received 2 percent of the stock of the corporation upon tendering $5,000 in cash and $5,000 in promissory notes was not supported by a preponderance of the evidence, (3) that the evidence did not support the personal and individual liability of the defendants, Zuideveld and Walters, and (4) that the evidence did not support count III of the complaint as to Zuideveld and Walters personally. Judgment was therefore given for the defendants as to counts I and III. Count II involved only the corporation and no proof was offered in connection with the claim against the corporation.

On May 16, 1978, the plaintiff filed a motion for rehearing and thereafter submitted a brief in support of that motion. Zuideveld filed a

brief opposing it. In a judgment order filed October 4, 1978, the trial court completely reversed itself and found for the plaintiff on both counts I and III, stating that he had erred in his original judgment "having misapprehended the law to be applied to the facts" and finding that the individual defendants, Zuideveld and Walters, had acted "individually and outside their corporate existence." The trial court therefore entered judgment as noted above. In this appeal, Jack Zuideveld again acted *pro se* and his brief on appeal does not conform fully to Supreme Court rules. However, he clearly raises contentions which, if correct, we consider to be dispositive of this case: (1) that the contract of employment in question and the associated purchase of stock were transactions between the plaintiff and Christian Audio Visual Corporation, not between the defendant, Zuideveld, and the plaintiff and (2) the "Financial Projection" of CAV and other statements made to the plaintiff by Zuideveld and Walters as officers of the corporation were not fraudulent in nature nor made with intent to deceive and therefore did not give rise to the doctrine whereby the corporate veil may be pierced and personal liability established on the basis of deliberate fraud practiced by the alter ego of the corporation.

■■■ As to Zuideveld's personal liability, it was established that the negotiations preceding the plaintiff's employment were conducted in the name of the corporation and that it was the corporation which offered the employment, not Zuideveld. While Walters, his wife, and Zuideveld were the incorporators and owned all of the stock of the corporation, the contract of employment clearly indicated that Zuideveld and Walters were signing as officers and on behalf of the corporation, not personally. It is therefore incumbent on the plaintiff if he wishes to go behind the corporate veil and fasten personal liability on Zuideveld as an individual to establish that the corporation, through Zuideveld, perpetrated a fraud on the plaintiff by making knowingly false statements to him, which were reasonably believed by the plaintiff and acted on to his detriment. (*Pustelniak v. Vilimas* (1933), 352 Ill. 270; *Mother Earth, Ltd. v. Strawberry Camel, Ltd.* (1979), 72 Ill. App. 3d 37; *Forrester v. State Bank of East Moline* (1977), 52 Ill. App. 3d 34; 19 Am. Jur. 2d *Corporations* §§1384 through 1386 (1965).) As set forth in *Citizens Savings & Loan Association v. Fischer* (1966), 67 Ill. App. 2d 315, 322-23:

> "As a general rule a corporate officer or director is not liable for the fraud of other officers or agents merely because of his official character, but he is individually liable for fraudulent acts of his own or in which he participates. [Citation.] The mere fact that a person is an officer or director does not per se render him liable for the fraud of the corporation or of other officers or directors. He is

liable only if he with knowledge, or recklessly without it, participates or assists in the fraud. [Citations.]"

Thus, the burden of proof is on the person attempting to pierce the corporate veil and to hold the officer or director personally liable to establish that the statement or information upon which such person acted was fraudulent; that the statement was uttered by the officer personally and that it induced the plaintiff to an action resulting in an injury to him are not sufficient. In most cases, even the fact that the statement is untrue is not enough to make it fraudulent. The Illinois cases have generally agreed, that as stated in *Broberg v. Mann* (1965), 66 Ill. App. 2d 134, and restated in *Mother Earth, Ltd. v. Strawberry Camel, Ltd.* (1979), 72 Ill. App. 3d 37, 48:

" '[A] misrepresentation to be the basis of a charge of fraud, either in a suit at law or in equity, must contain the following elements:

(1) It must be a statement of material fact, as opposed to opinion;

(2) it must be untrue;

(3) the party making the statement must know or believe it to be untrue;

(4) the person to whom the statement is made must believe and rely on it, and have a right to do so;

(5) it must have been made for the purpose of inducing the other party to act; and

(6) the reliance by the person to whom the statement is made must lead to his injury.' *Broberg v. Mann* (1965), 66 Ill. App. 2d 134, 139."

In the case before us, the allegation of fraud is based, so far as appears from the record, on the employment contract and the "Financial Projection," there being no other statements specifically mentioned in the complaint as being fraudulent. We will therefore examine the promises and representations contained in these two documents and the actual circumstances which occurred to see whether any discrepancy between the promises, projections or expectations reflected in the employment contract and the Financial Projection, as compared with what actually occurred, indicates that the statements contained in those two documents were knowingly false and indicative of fraudulent intent when they were made. First as to the employment contract, the only promise or representation contained in that document which was proved not to have been performed was in paragraph A, the payment of salary to the plaintiff at the rate of $25,000 per year, "payable monthly." Paragraphs B and D—hospitalization and life insurance—were clearly carried out as

indicated by the testimony of the insurance agent, so far as CAV was allowed to do so. Paragraph C relates to vacations which, in the light of what occurred, have no relevance. Paragraph E is also not subject to evaluation as a false misrepresentation inasmuch as the plaintiff himself terminated the employment. Paragraph F—starting date—was performed as modified by the plaintiff himself.

■■ We can consider then only the question of compensation as being a possible misrepresentation. The plaintiff was promised that he would be paid monthly at the rate of $25,000 per year, which is approximately $2,083 per month. He began his employment on July 6 and was promptly paid his July salary at the proper time—he does not contend otherwise. At the end of August, the plaintiff did not receive his salary for August. On September 15, he received a check for $1,061.51, being $500 short on a net pay check due him of $1,561.51. This check carries the notation that there is $500 due him and Zuideveld testified that he had a discussion with the plaintiff during September in which he promised the plaintiff that he would get "$500 with his pay check on October 1." Zuideveld testified that before he could deliver this pay check to the plaintiff he received a summons in the present lawsuit. He also testified that he had in his possession evidence indicating that the plaintiff had gone to the Illinois Unemployment Office and consulted with them on the 28th of September, stating that he was leaving his employment because he had not been paid as had been promised him. On cross-examination the plaintiff said he did not recall whether or not he had told the Illinois Unemployment Office that he was leaving his job on September 28. He did not deny he had visited that office on that date. All this adds up to, we think, is that the plaintiff was not paid in full for his August work, but there is no evidence that this was because of a fraudulent scheme. The defendant testified as to his strenuous efforts in August to get enough money together to meet the corporation payroll and that he himself had received less in pay during this period than the plaintiff received. It is evident that the corporation was thinly capitalized, but no allegations are made in the complaint that the financial resources of the corporation were fraudulently misstated. The plaintiff was aware that the corporation was newly organized and was raising capital by solicitation to invest by newspaper advertising. Plaintiff was over 50 years old, a college graduate with many years of business experience, and he could not have been unaware that new ventures pose some financial risk. It appears that Zuideveld and Walters ran out of money before they could get the corporation off the ground, but this does not necessarily indicate fraud—it might only mean that the time lag between income from sales and necessary pay roll expenses was miscalculated. The shortage in cash was acknowledged to the plaintiff and the obligation of his employment

contract was explicitly recognized in the notation on his pay check for August. While the shortage was certainly a breach of the contract, it did not suggest fraud as much as poor planning and unjustified optimism as to the operations of the company. Zuideveld testified that he made strenuous efforts to borrow as much money as he could to meet the corporation's payroll, to the extent that he himself emerged from the eventual debacle as a pauper. Under the circumstances, the failure of the corporation to pay the plaintiff in full for the month of August, due to a shortage of funds, while at the same time openly acknowledging the shortage and promising to make it good in the next pay check is not, in our opinion, such evidence of fraud or fraudulent intent as to fasten personal liability on the defendant as an officer and director of the corporation for damages calculated on a five-year employment contract.

The other aspect of the charge of fraud was the "Financial Projection" which the plaintiff was shown during the negotiations preceding his employment. We think it necessary to reproduce this in full to give point to our opinion that it was not, in content and form, such a statement as reasonably could be taken as a fraudulent misstatement of fact.

"The Financial Projection

1. Based on letters on hand from Christian book store owners, telephone calls and personal visitations, the prospect for having at least 2,000 of the estimated 10,000 Christian book stores as Christian Audio Visual Centers becomes a very meaningful reality.

2. 2,000 stores with an average purchase of $1,000.00 in audio visual supplies and equipment each month generates a buying volume of TWENTY FOUR MILLION DOLLARS per year.

3. With a 10% margin built-in for Christian Audio Visual Corporation on these exceptionally low prices paid by the Christian book stores, the return on the above indicated annual volume of purchases is TWO MILLION, FOUR HUNDRED THOUSAND DOLLARS.

4. The annual membership fee (discounting the first year fee of $500.00) of $250.00 for each store brings in an additional $500,000.00 per year to Christian Audio Visual Corporation.

5. Annual operating expenses for Christian Audio Visual Corporation to handle the above noted purchase volume and maintain the complete marketing/merchandising program as described in the corporate brochure runs $500,000.00 per year.

6. The average Christian book store *today* does more than $2,000.00 per month in audio visual sales as per recent publication documentation.

7. With gross profit of $2,400,000.00 to Christian Audio Visual Corporation, before taxes, it is likely that more than $1,000,000.00 would be retained *after taxes* for corporate dividend, properly divided between corporate salaries to stockholders and actual dividend payments.

8. A holder of one percent of the corporate stock would be gaining a return of approximately $10,000.00 per year while the investment for the stock itself would be only half that amount.

9. There is a very strong likelihood that the dollar volume done by Christian Audio Visual Corporation will greatly exceed the minimal order basis indicated above.

10. Though there may be competition down the road a year or two from now, aggressive merchandising would always keep CAV FIRST.!"

Paragraph 1 of the projection is obviously merely a projection, which uses the word "prospect" as to its result. It is not a statement of existing fact. Paragraph 2 is based strictly on the "prospect" engendered by paragraph 1. Paragraph 3 is mere arithmetical calculation based on the preceding paragraphs. Paragraph 4 is likewise pure arithmetic based on the preceding paragraphs. While paragraph 5 might be only a guess, there is no evidence to show that it was not in fact true. Likewise, paragraph 6 is apparently based on some publication and is not contravened by any other evidence. There is no evidence to show that it is false. Paragraph 7 may be a reasonable calculation if we accept the preceding postulates. Paragraph 8 is pure arithmetic based on the preceding paragraphs. Paragraph 9 merely speaks of a strong likelihood—it does not make a statement of fact.

Thus it can be seen that the financial projection is not a statement of fact within the meaning of the cases which predicate fraud on a knowing misstatement of fact. It is rather an argument based on obvious speculation calculated to induce the reader to invest in or work for CAV. The "projection" is just that, and a projection is an estimate or calculation of future results and conditions. In the scholarly opinion in the case of *Mother Earth, Ltd.*, noted above, the court says, in speaking of matters involving future conditions:

"Examining under this framework the evidence presented in the law division, we note that it was found that a representation regarding income, such as that alleged in the present case, is not a statement of fact and therefore is not actionable. On this point, however, Illinois law is well settled, holding consistently that although representations of future income are not actionable, representations as to past income of a business constitute statements of fact." 72 Ill. App. 3d 37, 48.

To the same effect is 37 Am. Jur. 2d *Fraud and Deceit* §57 (1968), which says:

"The general rule, which is supported by numerous decisions in almost all jurisdictions, is that fraud must relate to a present or pre-existing fact, and cannot ordinarily be predicated on representations or statements which involve mere matters of futurity or things to be done or performed in the future."

It is obvious that the financial projection in question here is not a statement of fact but is a calculation based on assumptions. No one would be justified in taking it as anything more than an estimate based on reasonable assumptions for the future. Assumptions are not facts or statements of fact. We think the financial projection did not amount to a statement of fact—it was nothing more than a logical estimate and as such was not a basis of fraud leading to the piercing of the corporate veil.

As to count III, based on a violation of the Illinois Securities Law of 1953, on the evidence before us we see no basis for a finding of violations of those paragraphs of section 12, relating to fraud and misrepresentation. The issue between the plaintiff and the defendants in connection with the stock transaction was whether the plaintiff was entitled to the shares of stock he had purchased immediately or not until he redeemed the promissory notes. It was not whether fraud or deceptive practices had entered into the sale. While the complaint alleges fraud in the sale of the corporation's stock, this was a mere conclusion on the part of the pleader; no proof was offered either that the stock was worthless or impaired at the time it was offered to the plaintiff or that any fraudulent statements were made inducing the plaintiff to invest in the stock. The subsequent difficulties of the corporation ending in its bankruptcy were not present at the time the plaintiff purchased the stock and, indeed, it is clear that the subsequent bankruptcy of the corporation was directly traceable to the pressure exerted by the plaintiff after he terminated his employment there. The refusal of the defendants to deliver the stock certificate until the notes were redeemed is not evidence of fraud. It appears that the defendants did not originally offer to take notes for the stock—the plaintiff demurred at paying $10,000 cash and thereupon the defendants agreed to accept $5,000 in cash and $5,000 in notes. Under these circumstances, the position of the defendants that they were not obligated to make delivery of the stock until the notes were paid is not *per se* fraudulent conduct such as is proscribed under section 12, subparagraphs F, G and I of the Illinois Securities Law of 1953, as alleged in the complaint. Whether or not there was any technical violation of the Securities Law under subparagraph A thereof we do not determine, since there was no evidence adduced on that point.

The plaintiff has paid $5,000 in cash and given two promissory notes

each for $2,500 to the corporation for two shares of stock. He is clearly entitled to have either a refund of the cash and the return of the notes or to have the two shares of stock issued to him. The stock was purchased from and the notes and cash therefore delivered to CAV and consequently are assets of the corporation. At the time of the trial the corporation was in bankruptcy but according to Zuideveld was still operating. The status of the corporation and its legal rights and obligations with regard to the stock transaction are not disclosed of record and are unknown to us. We are unable, in the present state of the record and in view of the possibility that the bankruptcy court may still retain jurisdiction, to make any order or finding as to the disposition of the stock and notes and money paid therefor by the plaintiff.

The plaintiff, so far as it appears from the record, has not received his pay for the month of September and the arrears of $500 for August. While Zuideveld testified that the plaintiff had been paid $2,500 as salary in October, this apparently was part of the escrow funds offered to settle the suit and which was not accepted as such by the plaintiff. The plaintiff is entitled, therefore, to be paid his salary for September plus the arrears, if any, still remaining for August. Since the promise to pay the plaintiff his $500 arrears for August and his September pay was made personally by Zuideveld at a time when he was aware that the corporation's finances were severely strained, we think it may fairly be interpreted as a personal promise by Zuideveld to pay the plaintiff his August and September salary. The plaintiff remained on the job and might not have done so but for Zuideveld's promise. We think, therefore, that Zuideveld became personally liable on his promise to pay the September salary and the August shortage to the extent they are not paid as a corporate liability.

The judgment of the circuit court of Lake County is therefore reversed as to count III, and as to count I the cause is remanded to the trial court with directions to modify the judgment for damages by reducing it to such sum as represents the salary due the plaintiff for August and September 1977.

Reversed as to count III.

Remanded as to count I with directions to modify.

LINDBERG and WOODWARD, JJ., concur.