Myron ASH, as Trustee of the J & W Corporation Liquidating Trust, Plaintiff–Appellant, Cross–Appellee,

v.

GEORGIA–PACIFIC CORPORATION, Defendant–Appellee, Cross–Appellant.

Nos. 90–3081, 90–3177.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 14, 1992.

Decided March 3, 1992.

Rehearing Denied March 27, 1992.

Nicholas P. Iavarone (argued), Laurel G. Bellows, Alan F. Block, Bellows & Bellows, Chicago, Ill., for plaintiff-appellant, cross-appellee.

Randall A. Hack, Garrett B. Johnson (argued), Mark L. Levine, Kirkland & Ellis, Chicago, Ill., for defendant-appellee, cross-appellant.

Before BAUER, Chief Judge, and COFFEY and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Before moving to Florida, Myron Ash hired Donald Wallenmeyer to run J & W Corporation, a motor common carrier based in Chicago. Wallenmeyer was an expert in the trucking business—expert enough to avoid detection for two years while diverting payments to his own shell corporation. Wallenmeyer arranged for J & W to furnish transportation to Georgia–Pacific Corporation, one of its principal clients, at less than Georgia–Pacific would have paid had Wallenmeyer filed the tariffs as he was

supposed to do. This made Georgia–Pacific's transportation buyers look savvy; in exchange they diverted some of the price to Wallenmeyer's pocket corporation. Diversion required two sets of books, and the truth eventually emerged. *Ash v. Wallenmeyer,* 879 F.2d 272, 275 (7th Cir.1989), holds that J & W may recover from Georgia–Pacific "damages on each shipment equal to the difference between the tariffed rates and the actual rates paid, subject to the defendants' being able to persuade the trier of fact that, if Wallenmeyer had charged the tariffed rate, Georgia–Pacific would have bought less than it did". The difference was $126,150, and a jury gave J & W every penny. Georgia–Pacific does not contest the sufficiency of the evidence, which we recite in the light most favorable to J & W. (We write of J & W rather than Ash, the technical plaintiff. Most of J & W's assets were acquired by another corporation; those left behind include this suit, and Ash runs a liquidating trust.) The jury tacked on about $947,000 in compensatory and $2.5 million in punitive damages. The district judge awarded Georgia–Pacific a new trial unless J & W accepted a remittitur to $546,150 in compensatory damages (including the $126,150 for underbilling) and $500,000 in punitive damages. J & W accepted the remittitur under protest. Both sides have appealed.

J & W believes that the district judge resented our first decision and sabotaged its claims—a hostility reflected in the steep remittitur and some smaller details. This is a curious submission, for J & W bypassed an opportunity to switch judges. More than an opportunity, it was a command from this court. When reversing the judgment on the first appeal, we concluded: "Circuit Rule 36 shall apply on remand." 879 F.2d at 276. Rule 36 provides that under certain circumstances, including a direction by this court, the case "shall be reassigned by the district court for trial before a judge other than the judge who heard the prior [proceedings]". Ash says: "Fearful that the case would be placed at the end of another judge's calendar, Ash's attorney signed a stipulation drafted by GP

to enable the case to remain before Judge Leinenweber".

■ As an original matter one might question whether the parties may waive a reassignment under Circuit Rule 36. Ash and Georgia–Pacific could not compel assignment of a complaint to the judge they named, could not agree to bypass the random assignment system normally used. Why then may litigants agree that a direction of this court to take a second random draw from among the judges shall be ignored? Rule 36 says that the case "shall" be reassigned, an instruction addressed to the district court rather than the parties. Nonetheless, we have held that litigants may agree to further proceedings before the same judge despite an order to which Rule 36 applies. *Cange v. Stotler & Co.,* 913 F.2d 1204, 1207–08 (7th Cir.1990). J & W does not ask us to revisit the subject, which we discuss no further.

■ Georgia–Pacific contends that it does not owe even one dollar. Wallenmeyer was J & W's chief operating officer. How could there be a fraud against J & W, Georgia–Pacific asks, when Wallenmeyer knew all? (Recall that this is J & W's suit; Ash, although the dominant shareholder in J & W, appears as trustee.) Any fraud on Ash personally cannot support liability, Georgia–Pacific adds, because he overlooked warning signals. Having failed to inquire further, Ash cannot contend that he acted in reliance on any misrepresentation. The district judge rejected both of these arguments, writing that our opinion is the law of the case. 1990 WL 70447, 1990 U.S.Dist. LEXIS 5434 (N.D.Ill.). So it is, but it governs only subjects presented and decided. *Gertz v. Robert Welch, Inc.,* 680 F.2d 527, 532–33 (7th Cir.1982). Neither of these subjects was raised by the parties on the first appeal; our opinion does not discuss either; accordingly, both are open now, and the district court should have addressed them.

■ Georgia–Pacific gains nothing from the process, however, because neither argument is tenable. Start with the contention that Ash did not investigate sufficiently. Illinois law is opaque concerning

the obligation to investigate so as not to be snookered. See *AMPAT/Midwest, Inc. v. Illinois Tool Works Inc.*, 896 F.2d 1035, 1041–43 (7th Cir.1990), which discusses the cases. On one subject state law is clear: if you ask the defrauder point blank, you need not investigate further. "In Illinois a liar may not lull the victim into a false sense of security and then say that the reliance was not justifiable." *Astor Chauffeured Limousine Co. v. Runnfeldt Investment Corp.*, 910 F.2d 1540, 1550 (7th Cir.1990). Ash asked Iverson, Georgia–Pacific's traffic manager, why Georgia–Pacific was not placing more business with J & W; Iverson replied that J & W's tariff rates were too high. Iverson knew that J & W was not charging tariff rates and that proceeds were being diverted to Wallenmeyer's firm. Ash could rely on what he heard, which was neither equivocal nor incredible. "In Illinois, one need not assume that his trading partners are lying." *Ibid.*

As for Wallenmeyer's role: although an agent's knowledge usually is imputed to the principal (here, J & W), the common law treats the principal as ignorant of facts known to an agent acting adversely to the principal, and for his own benefit. *Cowan v. Curran*, 216 Ill. 598, 617, 75 N.E. 322, 329 (1905); *McKey & Poague, Inc. v. Stackler*, 63 Ill.App.3d 142, 152, 20 Ill.Dec. 130, 137, 379 N.E.2d 1198, 1205 (1st Dist.1978); *Restatement (2d) of Agency* § 282(1) (1957). Yet in Illinois where the self-interested agent "is the sole or an essential representative of the corporation in the transaction in question, ... his knowledge is held to be imputable to the corporation." *Mutual Investment Co. v. Wildman*, 182 Ill.App. 137, 144 (1st Dist. 1913). "This 'sole actor' exception is founded on the notion that, where a principal cannot embrace a transaction except through the acts of an unsupervised agent, the principal must accept the consequences of the agent's misconduct because it was the principal who allowed the agent to operate without accountability." *First National Bank of Cicero v. Lewco Securities Corp.*, 860 F.2d 1407, 1417–18 (7th Cir. 1988). Wallenmeyer was honcho at J & W, and that, Georgia–Pacific insists, is that.

None of the "sole actor" cases we could find allows the imputation of knowledge to the principal where the adverse party knew that the agent was acting adversely to his employer—where, indeed, the adverse party participated in the fraud. Georgia–Pacific's argument implies that anyone who suborns the chief operating officer of a corporation has by virtue of that success purchased immunity from liability to the principal victim. We cannot believe that Illinois treats successful schemes as self-protecting. All of the cases Georgia–Pacific cites, and all of the others we could find, deal with innocent third parties. They hold that as between the employer of a dishonest agent and a stranger (a customer or holder in due course), the employer bears the responsibility—for it, at least, could select and monitor the agent. Exposure to liability then induces the employer to take cost-justified precautions. Georgia–Pacific did not need J & W to take precautions to protect it from Wallenmeyer; it was not in doubt where Wallenmeyer's loyalty lay. Iverson and Adamczyk, the traffic manager and plant manager of the Georgia–Pacific plant in Gary, were up to their necks in the scam (or so the jury could conclude). Illinois would preclude the participants in a fraud from appealing to the "sole actor" doctrine. See *Metropolitan Sanitary District v. Anthony Pontarelli & Sons, Inc.*, 7 Ill.App.3d 829, 840, 288 N.E.2d 905, 912 (1st Dist. 1972).

Georgia–Pacific offers one last argument: that the district judge should have excluded all evidence of the scheme to divert revenues to Wallenmeyer's hip-pocket corporation. J & W sued Wallenmeyer, Georgia–Pacific, Iverson, and Adamczyk on this score and settled for a judgment of $21,000 against Wallenmeyer (a judgment that has been only half satisfied). Ash dismissed the diversion claim against Georgia–Pacific with prejudice, leaving only the claim for underbilling. Our first opinion concluded: "For the further guidance of the district court we point out that Ash has abandoned his claim for diversion damages,

and therefore the further proceedings will be limited to the defendants' liability for, and the amount of, the underbilling damages." 879 F.2d at 276. Yet the district judge admitted evidence of the diversion, and J & W's damages expert admitted that when calculating J & W's loss he did not distinguish the injury attributable to underbilling from that attributable to diversion.

Failure to separate the two sources of loss in computing damages is a problem, but one cured by the remittitur (on which more below). Instead of concentrating on the difference between diversion and underbilling, Georgia–Pacific might have made headway by attacking the foundation of the award of compensatory damages. Underbilling supports only $126,150 of the award. The rest of the compensatory damages represents a reduction in J & W's going-concern value. While Wallenmeyer, Iverson, and Adamczyk were up to their tricks, Ash sold J & W's business and assets. J & W's theory is that the buyer paid a price based on J & W's profits; as profits had been reduced by the fraud, a huge capital loss ensued. Suppose the buyer was discounting J & W's profits at 10% per annum and expected the business to remain viable for 10 years; in that case a reduction of $60,000 per year in J & W's profits would yield a decrease of $368,674 in the price realized in the sale. A moment's thought shows, however, that to compute damages in this way is to sanction Georgia–Pacific for the prospect that it would continue to commit fraud after the sale—to award a remedy for twelve years of underbilling when the scheme lasted only two years. Whether Illinois law would support such an award is an interesting question, on which the parties have not enlightened us (because Georgia–Pacific did not contest this theory of damages). Our description of the method used to compute the award shows, however, why the remittitur solves the problem Georgia–Pacific does raise. No more than one-sixth of the diminution in profits may be attributed to the diversion; the rest showed up as savings to Georgia–Pacific. (The underbilling was $126,150, the diversion some $25,000.) The district judge lopped off half of the sum the jury selected as compensatory damages.

■■■■ Restating the objection as one to the introduction of evidence gets Georgia–Pacific nowhere. It treats the dismissal of J & W's diversion claim as conclusive proof that there was no diversion, or at least that it took part in none. Yet settlements do not establish facts. The law of judgments and the law of evidence are distinct. Cf. *Dowling v. United States*, 493 U.S. 342, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990). Dismissal operates as a bar to J & W's recovery from Georgia–Pacific on a diversion theory, but it does not control the evidence that may be introduced at trial on a tenable theory. Documents and testimony about the diversion were relevant to show the jury why Georgia–Pacific kept two sets of books and paid J & W less than the tariff rate. Describing what Iverson and Adamczyk were doing without showing what Wallenmeyer had to gain would have given the jury a misleading picture—one unduly favorable to Georgia–Pacific.

■■■ Of course the remittitur does not protect the award if, as J & W insists, the remittitur must be annulled as an abuse of discretion. All of J & W's animadversions against the judge and the remittitur do not overcome *Donovan v. Penn Shipping Co.*, 429 U.S. 648, 650, 97 S.Ct. 835, 837, 51 L.Ed.2d 112 (1977), which reaffirms "the longstanding rule that a plaintiff in federal court … may not appeal from a remittitur order he has accepted." Judge Leinenweber offered J & W a choice between $1,046,150 and a new trial. J & W chose the money. *Donovan* makes that choice conclusive.

■■■■ An order setting the case for a new trial is not final, and hence not appealable under 28 U.S.C. § 1291. An election between that new trial and a sum certain is final, but a party may not appeal from a judgment to which it consents. One who accepts a remittitur in lieu of a new trial has consented, and so may not appeal. J & W presents more than 40 pages of objections to this conclusion: it accepted under protest and thus did not "really" consent; a new trial would be a hardship because it

438

is expensive, because Ash needs money for medical care, because an expert witness may be hard to replace; the district judge's errors are so egregious that an appellate court has "inherent power" to correct them; and so on. None of these comes to grips with *Donovan;* to accept any would overthrow *Donovan.*

Perhaps J & W has been misled by the dual meanings of "remittitur". Courts sometimes use this word to refer to an option between a reduced award and a new trial; at other times courts speak of any reduction as a remittitur. *Donovan* deals only with the alternative award-trial case. J & W points us to many cases in which remittiturs were appealed, without recognizing that all were compulsory reductions. E.g., *Farber v. Massillon Board of Education,* 917 F.2d 1391, 1395 (6th Cir.1990); *O'Gilvie v. International Playtex, Inc.,* 821 F.2d 1438, 1447 (10th Cir.1987). It is J & W's election, and not the reduction, that stands in the way of appellate review.

A choice between an immediate but reduced award and a new trial is not, as J & W depicts it, some trick to snatch away the right to appeal. It is a consequence of the final-decision rule. Appeal awaits final decision, even if it is costly to reach that stage. J & W had every right to seek appellate vindication of its position. After the second trial it could have appealed, seeking reinstatement of the first jury's verdict. If as J & W says it cannot afford the same elaborate presentation it mustered the first time, or if the absence of witnesses (the expert and perhaps Ash himself in light of illness) undermines the case, then J & W may do poorly—but it has the first verdict to fall back on. A party electing the new-trial branch of the remittitur option may take a pratfall as quickly as it pleases, and thus expedite the appeal. Before *Donovan* some courts believed that the ease with which a party may engineer an appellate test implies the wisdom of immediate review, cutting out excess steps; the Supreme Court disagreed. Our part is to carry out that decision.

 To this J & W replies that the order setting the case for another trial was unnecessary. When a court reduces a verdict to the legal maximum, it need not award a new trial as an alternative. *Haluschak v. Dodge City of Wauwatosa, Inc.,* 909 F.2d 254, 257 (7th Cir.1990). If the court had chopped down J & W's verdict without permitting a new trial, J & W would have had no choice to make and could have appealed straightaway. Often it is true that, had the district judge done something else, the parties would have had different options. What might have happened, did not happen. J & W was offered a new trial. To avoid the need to choose, J & W sought a writ of mandamus; we denied its petition. In offering a new trial the district court did not exceed its jurisdiction or so greatly offend against legal norms that interlocutory intervention could be justified. Quite the contrary, we have never held that it is legal error to offer the alternative of a new trial, and in light of the seventh amendment it is difficult to depict the option of jury trial as forbidden. See *Dimick v. Schiedt,* 293 U.S. 474, 55 S.Ct. 296, 79 L.Ed. 603 (1935); *Earl v. Bouchard Transportation Co.,* 917 F.2d 1320, 1328–30 (2d Cir.1990). The offer to J & W was not a pointless formality. One of the principal problems might have been cured during further proceedings. The district court reduced the compensatory award in large measure because it believed the evidence and verdict inconsistent with J & W's position in an earlier hearing. J & W says that the judge should have recognized that counsel misspoke. Things could have been put straight at another trial. Put to the choice, J & W took the lower judgment, so *Donovan* controls.

 Although J & W may not challenge an award it has accepted, it is entitled to contest a decision that came later. J & W asked for prejudgment interest and attorneys' fees; the district court denied this motion. 1990 WL 70447, 1990 U.S.Dist.Lexis 12038. Illinois follows the American Rule under which each party normally bears its own legal expenses, and we agree with the district judge that Illinois does not shift fees just because the jury found that the losing party committed

 

fraud. An award is possible when the damages from the wrong are legal expenses—for example, when one person files a suit just because the high costs of defending would convey a competitive advantage. *Sorenson v. Fio Rito,* 90 Ill. App.3d 368, 45 Ill.Dec. 714, 413 N.E.2d 47 (1st Dist.1980). Wallenmeyer's scheme, carried out with the connivance of Georgia–Pacific, did not sock J & W with legal fees. Instead it reduced the profits from the trucking business. Legal expenses were J & W's idea, attractive because they facilitated recovery. That is the home ground of the American Rule.

 Now on to interest. Illinois provides for prejudgment interest on ascertainable damages. Ill.Rev.Stat. ch. 17 ¶ 6402; *Alguire v. Walker,* 154 Ill.App.3d 438, 447–48, 506 N.E.2d 1334, 1341 (1st Dist.1987); *Servbest Foods, Inc. v. Emessee Industries, Inc.,* 82 Ill.App.3d 662, 677, 37 Ill.Dec. 945, 957, 403 N.E.2d 1, 13 (1st Dist.1980) (collecting cases); *Forrester v. State Bank of East Moline,* 52 Ill.App.3d 34, 42–43, 6 Ill.Dec. 957, 962–63, 363 N.E.2d 904, 909–10 (3d Dist.1977). The award of consequential damages (lost going concern value or goodwill) does not meet this standard. Underbilling is a different matter. The difference between the rate bureau tariffs and the amounts J & W received from Georgia–Pacific was mechanically ascertainable, was indeed mechanically computed. True, Georgia–Pacific denied liability; true also, Georgia–Pacific might have been able to persuade the jury that it would have used less of J & W's services had the price been higher. But it lost on these contentions. The district court's only reason for withholding prejudgment interest was that "damages were hotly contested and right up to the jury's verdict it was unclear what plaintiff's loss had been." On this approach prejudgment interest could be awarded only when the prevailing party received summary judgment. That is not how Illinois views the matter. Defenses and offsets do not make a sum actually awarded less ascertainable. Interest may be awarded "although a good faith defense exists and even where the claimed right and the amount due require legal ascertain-

ment." *La Grange Metal Products v. Pettibone Mulliken Corp.,* 106 Ill.App.3d 1046, 1054, 62 Ill.Dec. 619, 626, 436 N.E.2d 645, 652 (1st Dist.1982); see also *L.W. Foster Sportswear Co. v. Goldblatt Brothers, Inc.,* 356 F.2d 906, 910 (7th Cir.1966) (Illinois law); *Art Press, Ltd. v. Western Printing Machinery Co.,* 852 F.2d 276, 279 (7th Cir.1988) (same). It may be that a party recovering punitive damages usually does not get prejudgment interest; the two are alternative ways of compensating for delay and risk. See *Fortino v. Quasar Co.,* 950 F.2d 389, 397–98 (7th Cir.1991). As Georgia–Pacific does not make such an argument, however, we do not consider the possibility.

Except to the extent it omits prejudgment interest on the underbilling damages, the judgment is affirmed. The case is remanded for the award of prejudgment interest on $126,150 of the judgment.