**In re KZK LIVESTOCK, INC., Debtor.**

**Richard E. BARBER, not individually but as Trustee for the estate of KZK Livestock, Inc.**

**v.**

**PRODUCTION CREDIT SERVICES OF WEST CENTRAL ILLINOIS, FLCA, and Production Credit Services of West Central Illinois, PCA, Defendants.**

Bankruptcy No. 91–82986.
Adversary No. 95–8069.

United States Bankruptcy Court,
C.D. Illinois.

May 21, 1998.

See also, 221 B.R. 464, 221 B.R. 483.

Alan J. Fulkerson, Riordan & Larson, Chicago, IL, for trustee.

Richard E. Barber, Hanlon & Barber, Galesburg, IL, trustee.

John Bisbee, Macomb, IL, Robert Lindstrom, Mustain, Lindstrom & Henson, Galesburg, IL, for Defendant.

## *OPINION*

WILLIAM V. ALTENBERGER, Chief Judge.

Kendall Knowles (KNOWLES) was the sole shareholder, director, and officer of KZK Livestock, Inc., an Illinois Corporation (KZK). KNOWLES had a loan with Production Credit Services of West Central Illinois, FLCA and Production Credit Services of West Central Illinois, PCA (jointly referred to as "PCA"). KZK repaid the loan. KNOWLES was also operating a check kite involving a KZK bank account at the First National Bank of Blandinsville (FIRST). The funds used to repay the loan came from the bank account at FIRST. KZK's Trustee in bankruptcy (TRUSTEE) sued PCA to recover the loan repayment. Count I is brought under § 548(a)(1) of the Bankruptcy Code and Count II is brought pursuant to § 548(a)(2) of the Bankruptcy Code, 11 U.S.C. § 548(a)(1) and (2), to recover an alleged fraudulent conveyance. Counts III and IV are brought pursuant to § 5(a)(1) and (2) of the Uniform Fraudulent Conveyance Act as adopted by the State of Illinois, 740 ILCS § 160/5(a)(1) and (2).[1]

PCA filed an answer denying a fraudulent conveyance occurred and filed affirmative defenses. The TRUSTEE filed a motion for partial summary judgment as to Count II. PCA filed a motion for summary judgment as

to all counts. A hearing was held and the motions were taken under advisement.

Before deciding the issues raised by the motions for summary judgment, there is a preliminary matter raised by PCA's motion to strike certain discovery being relied on by the TRUSTEE, which has to be resolved. In his motion for summary judgment, the TRUSTEE states that he is relying on depositions of KNOWLES taken on the following dates:

(1) March 19, 1992

(2) July 13, 1995

(3) August 22, 1995

(4) September 20, 1995

(5) December 12, 1995

(6) October 4, 1996

PCA seeks to strike any deposition transcript at which PCA was not present when the deposition was taken.[2]

PCA relies upon Federal Rule of Civil Procedure 32, which governs the use of depositions in court proceedings, and provides, in part:

(a) **Use of Depositions.** At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions....

In response, the TRUSTEE cites a number of cases which hold that a deposition may be

---

1. A check kiting scheme operated by KNOWLES using a KZK bank account preceded KZK's bankruptcy and the filing of three adversary proceedings under § 548 of the Bankruptcy Code against three different types of Defendants, all of which were presented for decision by motions for summary judgment that were taken under advisement. This adversary involves the TRUSTEE's action to recover loan repayments from a lender/creditor. Adversary No. 95–8142 involves the TRUSTEE's action to recover funds paid by KZK to a bank that had improperly transferred funds from an account belonging to a related corporation. Adversary No. 95–8015 involves the TRUSTEE's action to recover funds paid from KZK's account to another bank to cover the check kite. Being concerned that there could be

common legal principles that would impact all three cases, this Court elected to consider the issues of all three cases at the same time. Therefore, all three Opinions are being issued concurrently.

2. According to PCA's motion to strike deposition transcripts, the deposition of March 19, 1992, was taken in relation to the involuntary petition; the deposition of July 13, 1995, was taken in the case of *Barber v. Union National Bank of Macomb,* Adv. No. 93–8303; the depositions of August 22, 1995, and September 20, 1995, were taken in the case of *Barber v. Colchester State Bank,* Adv. No. 95–8015.

considered by the court as a substitute affidavit under F.R.C.P. 56(c) and (e), even though the conditions of F.R.C.P. 32(a) for use of a deposition at trial are not met. *Hoover v. Switlik Parachute Co.*, 663 F.2d 964, 966–67 (9th Cir.1981); *Microsoft Corp. v. Very Competitive Computer Products*, 671 F.Supp. 1250 (N.D.Cal.1987). These courts posit that it would be pointless to require the witness to file an affidavit when their previous deposition met all the requirements for an affidavit. Other courts have followed that rule. *Peterson v. Instapak Corp.*, 690 F.Supp. 697 (N.D.Ill.1988); *In re Baker & Getty Financial Services, Inc.*, 98 B.R. 300 (Bkrtcy.N.D.Ohio 1989).

■ This Court agrees with the cases cited by the TRUSTEE. While the depositions taken outside PCA's presence could not be used at trial, they can be used to support a motion for summary judgment. They met the requirements for an affidavit and if PCA believed they were incomplete or inaccurate all it would have had to do is file additional portions of the deposition or counter affidavits.

However, there is another reason, not raised by PCA, why the depositions cannot be used to support the TRUSTEE's motion. In the TRUSTEE's motion, he states that he is relying on five depositions of KNOWLES taken in connection with proceedings other than the one involving PCA. With the exception of the deposition taken on October 4, 1996, none of the depositions or excerpts upon which the TRUSTEE is relying have been filed in this adversary proceeding. All that is before this Court is the TRUSTEE's statement of what is in a particular deposition, along with a reference to a particular deposition.

■ Rule 56(c) of the Federal Rules of Civil Procedure, applicable here through Rule 7056 of the Rules of Bankruptcy Procedure, provides, in part:

[T]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). Depositions which are not attached to or incorporated into the record on a motion for summary judgment cannot be considered. *Maier–Schule GMC, Inc., v. General Motors Corporation (GMC Truck and Bus Group)*, 154 F.R.D. 47 (W.D.N.Y.1994). It does not aid the TRUSTEE that the depositions have been filed in another adversary proceeding filed by him in this Court. Each adversary proceeding, while perhaps not a different "case", as that term is used in the bankruptcy parlance, is a separate and distinct proceeding.[3] Courts do not search outside a record in order to notice documents in another case, even where the same parties are involved, unless the proceedings are put in evidence. *Funk v. Commissioner of Internal Revenue Service*, 163 F.2d 796 (3d Cir.1947); *Paridy v. Caterpillar Tractor Co.*, 48 F.2d 166 (7th Cir.1931). Though the rule has generally been strictly construed, exceptions have developed. *Funk, supra.* Whether the doctrine of judicial notice will be applied turns upon considerations of expediency and justice under the particular facts of a case, as well as upon what the court is asked to notice. *Funk; In re Eagson Corp.*, 37 B.R. 471 (Bkrtcy.E.D.Pa.1984). It is a matter of judicial discretion. A number of bankruptcy courts have refused to take judicial notice of pleadings or documents from the underlying case even when requested by a party. In *In re Eagson, supra*, the court took judicial notice of pleadings in a prior adversary proceeding because the two proceedings involved the identical parties and subject matter, finding that the proceedings were not, in reality, separate and distinct. In the present case, the TRUSTEE relies upon depositions filed in other adversary proceedings brought by him against other defendants. Thus, the parties are not the same. While some of the same legal principles are involved, the subject matters of the proceedings are entirely

---

**3.** A "case" is a proceeding involving the liquidation or reorganization of a debtor. A "case" is distinguished from both adversary proceedings and contested matters, which arise in a "case." *In re Southern Indus. Banking Corp.*, 189 B.R. 697 (E.D.Tenn.1992).

different. In addition, it is KNOWLES' testimony which is the heart of this case. Records of KZK, as well as of KNOWLES' other corporations, are missing or incomplete. Given both the nature of the depositions and the dissimilarity of the proceedings, this Court declines to consider the five depositions filed in other adversary proceedings.

The peril, should this Court look outside the record presented, is apparent. The depositions relied on by the TRUSTEE consume over 800 pages. The TRUSTEE cites to less than twenty references in the depositions. Though the parties are directed to specify portions of depositions upon which they rely to support factual assertions, it has always been the practice of this Court, and indeed its obligation, to review filed depositions in their entirety. Here the parties have represented to the Court that they agree on the basic facts, but differ widely on the inferences to be drawn from those facts and the conclusions of law to be made based upon those facts. If these unfiled depositions are to be considered a part of the record, PCA would be entitled, on its motion, to all favorable inferences that may reasonably be drawn therefrom. The same would be true for the TRUSTEE. The Court would be more or less on its own, grappling with the difficult issue of unity of interests between KZK and KNOWLES, and might well draw inferences from the facts unanticipated by either party. That is not how cases of this kind should be decided. Nor, as a practical matter, is it this Court's responsibility to search through the main case and other adversary proceedings to locate the depositions and file them in this adversary proceeding. That is the responsibility of the parties. The TRUSTEE claims to be relying on a deposition of KNOWLES dated March 19, 1992. Depositions of KNOWLES dated January 22, 1992, and March 13, 1992, (captioned a "resumed" deposition) are filed as a part of the main case proceedings as well as in a separate adversary proceeding. This Court has no way of knowing for certain if the reference to the March 19, 1992, deposition is a typing error or if KNOWLES was in fact deposed on that date.[4]

Notwithstanding the ruling that the depositions cannot be relied upon, this Court will decide the cross motions for summary judgment on the basis that there are no material questions of fact. At the hearing on the cross motions for summary judgment, the parties were asked if there were any. After some discussion, both the TRUSTEE and PCA advised there were none, only conclusions to be drawn from the facts and how the law was to be applied. In so advising the Court of their position, the parties made it crystal clear that regardless of the ruling on the motion to strike the depositions, they wanted the case decided by their cross motions.

■ Turning then to the substantive issues, in order to prevail on his motion, as to Count II under § 548(a)(2), the TRUSTEE must establish:

 1. A transfer of Debtor's property;

 2. Within one year of the filing of the bankruptcy; and

 3. For less than reasonably equivalent value.[5]

As to the first element under § 548(a)(2), PCA, by both its answer and affirmative defense, contends that the Debtor's property was not transferred because:

 a. The Debtor had no interest in the transferred funds as they were generated by the check kite; and

 b. The transferred funds were earmarked.[6]

As to the first contention, the decision of the Seventh Circuit Court of Appeals in the *Matter of Smith*, 966 F.2d 1527 (7th Cir.1992), is

---

4. This Court suspects the former. As previously noted, PCA identifies the "March 19, 1992" deposition as having been taken in relation to the involuntary petition. In addition, in the TRUSTEE's answers to the first interrogatories propounded by the PCA, (Doc. 70–1), the TRUSTEE notes that his attorney deposed KNOWLES in the underlying bankruptcy on January 22, 1992, and again on March 13, 1992.

5. There is no issue as to the one year requirement and the TRUSTEE's motion excepts any determination of insolvency, which also is a requirement under § 548(a)(2).

6. At the hearing on the motions, PCA abandoned the earmarking defense.

controlling. In that case the court held that where a debtor, through a simple check kite, generated funds used to repay a loan due the defendant, the funds were the debtor's property for preference purposes.[7]

As to the third element under § 548(a)(2), PCA argues KZK received reasonably equivalent value because KZK and KNOWLES were one in the same and applying the theory of reverse piercing of the corporate veil, its loan to KNOWLES was value to KZK, which repaid it. The TRUSTEE makes a legal argument that reverse piercing of the corporate veil is not available. The TRUSTEE relies on *Stoebner v. Lingenfelter*, 115 F.3d 576 (8th Cir.1997), a case decided under Minnesota law. The district court struck the transferee's proposed corporate veil-piercing defense, determining that there were no equitable considerations to support it. The Court of Appeals agreed, stating:

> Minnesota courts do not apply the doctrine where nonprincipals, such as [the transferor's] innocent creditors, will be harmed. *See In re Bellanca Aircraft Corp.*, 56 B.R. 339, 399 (Bankr.D.Minn. 1985), aff'd in part and remanded in part, 850 F.2d 1275 (8th Cir.1988); *Cargill, Inc. v. Hedge*, 375 N.W.2d 477, 479 (Minn. 1985). Further, even if the doctrine were applicable to this case, [the transferee] was unable to convince the jury that he took payments from [the transferor] in good faith. Thus it was not necessary for the jury to decide whether one of the corporations was an alter ego of another principal. In the absence of a finding of good faith on [the transferor's] part, leaving the corporate veil intact is not fundamentally unfair.

Because the case involves Minnesota law, it is not particularly helpful.

PCA relies on two decisions, neither of which was decided in the bankruptcy context. In *Boatmen's National Bank of St. Louis v. Smith*, 706 F.Supp. 30 (N.D.Ill.1989), a judgment creditor filed a motion for turnover against the debtor's corporation. Holding that reverse piercing of the corporate veil was appropriate, the court stated:

> Before invoking the relevant case law which forms the foundation for piercing "in reverse," we note that defendants have failed to provide us with legal support for their own position. This inability is relevant because, at the outset, we note that the concerns which form the basis of the traditional doctrine are quite applicable to piercing "in reverse"—that corporate status not encourage irresponsible individual activity by shielding wealth from efforts to assess responsibility for those actions.

> Although no Illinois court has squarely addressed this issue, there is ample authority from other jurisdictions to support plaintiff's theory. Other federal courts applying the law of other jurisdictions have pierced the corporate veil to satisfy an individual's tax liability. Illinois law finds nothing sacrosanct about limited liability. For example, the veils of subsidiary corporations have been pierced so as to satisfy judgments resulting from acts of the corporate parent. As a legal, matter therefore, we find nothing problematic about reversing the traditional piercing procedure. (Citations omitted).

The court in *Boatmen's* applied the requirements for piercing the corporate veil set forth by the Seventh Circuit Court of Appeals in *Van Dorn Co. v. Future Chemical and Oil Corp.*, 753 F.2d 565 (7th Cir.1985):

> [F]irst, there must be such unity of interest and ownership that the separate personalities of the corporation and the individual [or other corporation] no longer exist; and second, circumstances must be such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice.

Finding both requirements to be met, the Seventh Circuit Court of Appeals affirmed the district court's ruling that the judgment against the debtor could be satisfied out of corporate funds.

---

**7.** PCA raised a factual issue of whether kited funds were used to repay the loan. While it is not clear from the record if kited funds were used, it is not determinative under Count II. If kited funds were used, the *Smith* decision is controlling. If kited funds were not used, the funds were clearly the property of KZK.

PCA also relies upon *Sea–Land Services, Inc. v. Pepper Source,* 941 F.2d 519 (7th Cir.1991). There, a judgment creditor of a defunct corporation brought suit against the corporation's sole shareholder and five other business entities owned by the individual shareholder, seeking first to pierce the corporate veil and hold the individual personally liable for the judgment and then to "reverse pierce" the individual's other corporations rendering them liable as well. The district court granted the judgment creditor's motion for summary judgment. On appeal, the Seventh Circuit Court of Appeals stated that the factors to be considered in determining whether to disregard a corporate entity were:

> (1) the failure to maintain adequate corporate records or to comply with corporate formalities; (2) the commingling of funds or assets; (3) under-capitalization; and (4) one corporation treating the assets of another corporation as its own.

The court agreed with the district court that the first requirement of "shared control/unity of interest and ownership" for piercing the corporate veil was met, but held that the judgment creditor's proof fell short of establishing that honoring the separate corporate existence "would sanction a fraud or promote injustice." Thus, it would appear unquestionable that under Illinois law, reverse piercing of the corporate veil is a viable doctrine, and apparently federal courts will apply it under state law to permit a single creditor to satisfy its indebtedness without regard to claims of other creditors, or so it would appear under the *Sea–Land Services* decision, a nonbankruptcy decision.

 However, the Seventh Circuit Court of Appeals noted in *Scholes v. Lehmann,* 56 F.3d 750 (7th Cir.1995), that reverse piercing of the corporate veil is a "rarity," and it is rarer yet in bankruptcy. While it is well established that a transfer made solely for the benefit of a third party is not usually made for reasonably equivalent value, exceptions exist where the debtor benefits indirectly by reason of a symbiotic relationship with the third party, as in affiliated corporations, or where the debtor and the third party share an "alter-ego" relationship, such that consideration to one is consideration to the other and thus constitutes a direct benefit. *In re Marquis Products, Inc.,* 150 B.R. 487 (Bkrtcy.D.Me.1993). The application of corporate veil piercing principles in the context of bankruptcy transfer avoidance actions is governed by state law. *In re Pajaro Dunes Rental Agency, Inc.* 174 B.R. 557 (Bkrtcy.N.D.Cal.1994); *Marquis Products, supra.* Thus, PCA can establish it gave reasonably equivalent value if it can show through the theory of reverse piercing of the corporate veil, that there was a unity of interest between KZK and KNOWLES and that recognizing KZK's separate existence would cause an injustice. PCA bears the burden of proof on these issues. *Murphy v. Walters,* 87 Ill.App.3d 415, 410 N.E.2d 107, 43 Ill.Dec. 107 (2d Dist.1980).

 Before addressing those issues, it should be noted that the TRUSTEE has the initial burden of producing evidence that KZK did not receive reasonably equivalent value for the transfer to PCA. The TRUSTEE met this burden when he showed that the loan was made to KNOWLES individually, that KZK was a corporation in which KNOWLES was the sole shareholder, director and officer and that KZK repaid the loan. The crux of the case then becomes whether PCA established the doctrine of reverse piercing of the corporate veil. PCA must establish both a unity of interest between KZK and KNOWLES, and that the observance of a separate corporate identity would result in an injustice. As to the first element, PCA has not sustained its burden of proof. Under Illinois law, "piercing of the corporate veil" is not favored and the power to do so is exercised reluctantly and cautiously. *C M Corp. v. Oberer Development Co.,* 631 F.2d 536 (7th Cir.1980); *In re Kevin W. Emerick Farms, Inc.,* 201 B.R. 790 (Bkrtcy. C.D.Ill.1996). The analysis is very fact intensive. *Chicago Dist. Council of Carpenters Pension Fund v. Vacala Masonry, Inc.,* 946 F.Supp. 612 (N.D.Ill.1996). In the present case, the facts upon which this determination is to be made are sparse. It is uncontested that 1) KNOWLES received no salary from KZK; 2) KZK never prepared or filed any income tax returns; 3) KZK paid no

stock or cash dividends; and 4) KNOWLES paid $10,000 as the initial capitalization of KZK. It is true that where there has been a disregard of corporate formalities, there may be a basis for piercing the corporate veil. However, such factors are not significant in isolation. PCA points to the fact that both KZK and KNOWLES raised feeder pigs and makes general allegations that assets were commingled. Based on the TRUSTEE's failure to produce certain corporate records and a general ledger, PCA concludes that none existed.

There are also facts in the record which support a finding that KZK's separate corporate existence should not be disregarded. KZK was incorporated in late January, 1991, and an involuntary bankruptcy petition was filed against it on December 27, 1991. KNOWLES turned himself into federal authorities in December of 1991 and KZK subsequently consented to its adjudication as a debtor under Chapter 11 on August 24, 1993. Thus, KZK's actual existence was just shy of one year and its failure to file tax returns and pay dividends should not be accorded great weight. According to the undisputed facts, corporate meetings were held on three separate occasions in 1991. In the only deposition that is properly before this Court, KNOWLES testified that KZK was formed in order that he could feed more hogs and to maintain separate businesses for the different feed companies. He also testified that he maintained separate inventory sheets on the hog inventories, but that those records are missing. He testified that KZK paid rent on facilities in which its hogs were kept and that KZK paid its portion of the feed bills, even though all bills came in his name. While it is true that KNOWLES used KZK's account at FIRST to operate a check kite and monies flowed back and forth between KNOWLES' account and KZK's account, real proof that KNOWLES generally treated corporate assets as his own and that KZK was a mere facade is missing from this record.

As to the second element, it is a question of law and this Court concludes that in the context of bankruptcy, the observance of separate corporate entities would not promote an injustice, but on the contrary, regarding KNOWLES and KZK as a single entity would cause an unfair result. The reason for that conclusion is that there is a difference in the result depending on whether the doctrine is applied in a nonbankruptcy situation and a bankruptcy situation. Outside the realm of bankruptcy, there are ordinarily just three parties to consider when making this determination. As the court noted in *Marquis Products, supra,* the policy underlying § 548 of the Bankruptcy Code is to protect creditors against the depletion of the bankruptcy estate through transfers of the debtor's interests in property made without adequate consideration. A paramount principle of the bankruptcy laws is equality of distribution of the assets of the estate. The interests of other creditors must be considered. To permit a single creditor, in this case PCA, to keep a substantial payment while other creditors have to share in the remaining assets would lead to an unfair result.

PCA also argues that it holds a right of setoff, which is a defense to the fraudulent conveyance action under § 548(a)(2). The nature of PCA's contention that its right of setoff protects it from the TRUSTEE's alleged claim of a fraudulent conveyance is not exactly clear. Its reliance on the right of setoff is unique and no authority is cited in support of its contention. In its answer it alleges that KNOWLES converted its collateral and gave the proceeds to KZK. Therefore, it had a right of setoff against KZK when it received payment from KZK. That same contention is raised in the joint pretrial statement and in its brief in support of its motion for summary judgment. However, in its motion for summary judgment, PCA contends that KNOWLES transferred hundreds of thousands of dollars more to KZK than he received from KZK and that KNOWLES was entitled to setoff the excess transferred to KZK. In its brief, PCA also contends that as KNOWLES transferred more money to KZK than KZK transferred to him, KNOWLES was entitled to setoff under § 553 of the Bankruptcy Code, 11 U.S.C. § 553. KNOWLES was the primary beneficiary of the payment to PCA, received the consideration in that his loan with PCA was paid and met every setoff element. Then in its response to the TRUSTEE's motion for

summary judgment, PCA contends the payment to it was for the benefit of KNOWLES, that under § 550 of the Bankruptcy Code, 11 U.S.C. § 550, the TRUSTEE could have sued KNOWLES, but didn't do so, and if the TRUSTEE had sued KNOWLES, then KNOWLES would have had the right of setoff, which defense would have benefitted PCA.

The reasons why the nature of PCA's contention is not exactly clear is twofold. First, it is not clear if PCA is contending that a setoff occurred prepetition or if it has a postpetition right of setoff, which defeats the TRUSTEE's alleged fraudulent conveyance action. Second, it is not clear if PCA is claiming a right of setoff in its own right or claiming KNOWLES right of setoff.

In discussing § 553 and the right of setoff, 5 *Collier on Bankruptcy* ¶ 553.03 (15th Rev. Ed.) states in part as follows:

■—Claim and Debt Must Be Mutual.

The third basic requirement of section 553 is that the relevant claim and debt must be "mutual." In general, courts have held that the requirement of mutuality should be strictly construed. The requirement of strict construction, however, begs the more difficult question of actual meaning of the concept.

[a]—"Mutual" Not Defined by Code.

The Bankruptcy Code does not define the term "mutual," and the large body of case law interpreting its meaning is somewhat confusing. Much of the confusion stems from the multiplicity of concepts used to describe its requirements. The most frequently examined are the requirement that the prepetition claim and debt must be owed between the "same parties" and the closely parallel requirement that the parties must be acting in the same "capacity." The cases, however, also speak of the requirement that the obligations must be owed in the same "right." In addition, the decisional law directs that the obligations need not be of the same "character," and that the prepetition claim and debt need not have arisen in any particular order or out of the "same transaction." Finally, the cases have found within the meaning of "mutuality" the require-

ment already otherwise prescribed by the text of section 553(a) that the relevant claim and debt must be "prepetition" in nature.

In general, the various subconcepts which underlie the master concept of "mutuality" share a common purpose: to define the kinds of prepetition claims and debts that may be justly offset in bankruptcy. Although these subsidiary concepts are equitable in origin, their meanings have become relatively fixed in many practical respects, so that it is possible to determine with a fair degree of precision the categories of setoffs that may be permitted in bankruptcy.

[b]—Claim and Debt Must Exist Between Same Parties.

The threshold requirement of mutuality is that the relevant claim and debt must exist between the "same parties." This requirement prevents so-called "triangular setoffs." The requirement recognizes several important exceptions in the case of contractual setoffs and certain setoffs by governmental units.

[I]—Triangular Setoffs Generally Not Permitted.

In general, a triangular setoff arises if A attempts to offset an obligation owed by B against B's debt to C. Setoffs of this kind are not permitted under section 553. Thus, two entities, even if related, may not aggregate their debts and claims for setoff purposes. For example, a subsidiary may not offset a debt to the debtor against a debt the debtor owes to another related subsidiary....

Similarly, a debtor or a debtor's estate cannot offset its debt against a claim of its employer. Nor may a married couple offset a personal debt owed to a debtor against a claim held by the husband's company.

The reasons for the prohibition against triangular setoffs are straightforward. Triangular setoffs are not generally allowed under applicable nonbankruptcy law, and it is generally recognized that bankruptcy does not expand the rights of creditors beyond their nonbankruptcy entitle-

ments. Similarly, preservation of setoff rights in bankruptcy bestows a preferred status, often permitting the creditor to realize more than it would if the right were not preserved. Allowing triangular setoffs would open the door to all sorts of applications, thereby encroaching upon the fundamental bankruptcy policy of equality of distribution without serving the basic purposes that preserving rights of setoff in bankruptcy were designed to serve. (Footnotes omitted.)

■ Regardless of the exact nature of its contention, PCA is not entitled to claim a right of setoff, because contrary to its general assertion that all the elements for a setoff are present, the element of mutuality is missing. Its first contention appears to involve just two parties and is based on the idea that the setoff occurred prepetition. It fails because assuming that PCA had a claim against KZK, KZK had no claim against PCA, nor did KNOWLES have any claim against PCA. PCA held two claims against KNOWLES. One for the loan and one for the conversion. The payment to PCA by KZK was a voluntary payment without any legal obligation to do so.

■ Its second setoff contention appears to involve three parties and is based on the idea that the setoff occurred prepetition. It fails because as is pointed out in *Collier*, in the triangular situation, mutuality is lacking and triangular setoffs are generally not permitted. A creditor simply cannot claim a right of setoff to justify payment from a third party not indebted to it, but who is indebted to the debtor. PCA's claim against KNOWLES could not be satisfied by the short cut of KZK paying PCA direct, rather than KZK paying KNOWLES and KNOWLES paying PCA.

Its third and final setoff contention appears to involve three parties and is based on the idea that it can claim a right of setoff postpetition to defeat the TRUSTEE's alleged fraudulent conveyance action, arguing it would not be fair or right and would promote an injustice if the TRUSTEE could

recover from PCA who received the payment, when he could not recover from KNOWLES, the person who received the benefit of the payment.[8] Being a triangular relationship, the defense fails for a lack of mutuality. Furthermore, in the context of this case, a right of setoff cannot be used to defeat a fraudulent conveyance action. See *In re Colmark I Ltd. Partnership*, 189 B.R. 253 (Bkrtcy.D.Conn.1995).

■ PCA's last argument is that the TRUSTEE can not recover as KZK had no true creditors at the time of the transfers. The following is quoted from PCA's brief at page 13:

A common element in all four counts of Trustee's complaint is that the debtor must have the actual intent to defraud its creditors. Axiomatic to this element is the need for creditors at the time of the transfer. The Trustee admits only two creditors existed at the time of the transfers, Purina Mills and [FIRST]. Neither are "true" creditors giving the Trustee standing to sue on their behalf.

PCA erroneously lumps all the counts into one for analysis purposes and in the process misstates the law. Under § 548(a)(1), the intent to defraud may be directed toward existing or future creditors, and the transfer may be set aside, without regard to the nature of the claims of the defrauded creditors. 5 *Collier on Bankruptcy*, ¶ 548.04[1] (15th Rev.Ed.1997). The language of the statute so provides. 11 U.S.C. § 548(a)(1). PCA's argument that KZK had no creditors at the time of the transfer goes, at least in part, to the issue of whether KZK was insolvent on the date that the transfer was made or became insolvent as a result of the transfer. That is a specific element of the TRUSTEE's cause of action under § 548(a)(2), which has been excepted from the TRUSTEE's motion for summary judgment. For purposes of the motions before this Court, PCA's argument is better directed to Counts III and IV, brought under § 544(b) of the Bankruptcy Code and

---

8. While this argument is made in its response to the TRUSTEE's motion for summary judgment in the context of the right of setoff, a reference to

§ 550 leads this Court to wonder if the argument is one under § 553 or one under § 548 and § 550.

§§ 5(a)(1) and (2) of the Illinois Uniform Fraudulent Transfer Act.[9] Section 544(b) provides that "[t]he trustee may avoid any transfer of an interest of the debtor in property ... that is voidable under applicable law by a creditor holding an unsecured claim ..." Thus, in order to prevail under 544(b), the Trustee must first establish that, at the time of the transfer, there was an existing creditor who was holding an unsecured claim.

PCA contends the only two possible entities that could be considered creditors are PURINA MILLS and FIRST. PCA contends that PURINA MILLS is not a true creditor because it knew all about the incorporation of KZK and the transfer of assets from KNOWLES to KZK. PCA's contention is without merit. First, the record is entirely lacking as to what PURINA MILLS knew or didn't know. Second, those allegations, even if true, hardly taint PURINA MILLS' claim or deprive it of its status as a legitimate creditor. PCA also points to KZK's failure to observe the corporate formalities in obtaining the loan from PURINA MILLS. As the TRUSTEE points out, however, because KNOWLES had the apparent authority to borrow money, KZK is bound and because KZK received the proceeds, it in effect ratified KNOWLES' prior actions.

▪ PCA objects to FIRST's status as a legitimate creditor because it did not have a standard lending relationship with KZK, but that its claim arises only because of the check kite in which FIRST's President participated. The court in *In re RCM Global Long Term Capital Appreciation Fund, Ltd.,* 200 B.R. 514 (Bkrtcy.S.D.N.Y.1996) rejected a defendant's similar contention that the debtor's creditors were insiders and did not confer standing on the trustee, explaining:

> In addition, there may be allowable insider claims sufficient to confer standing, assuming, without deciding, that a debtor cannot maintain a fraudulent transfer ac-

tion on a constructive fraud theory under either New York or federal law without creditors existing at the time of the transfer. It is true, as [the Defendant] states, that where avoidance would benefit only the equity, the debtor in possession lacks standing to maintain a fraudulent conveyance action. *Vintero Corp. v. Corporacion Venezolana De Fomento (In re Vintero Corp.),* 735 F.2d 740, 742 (2d Cir.1984); *Whiteford Plastics Co. v. Chase Nat'l Bank,* 179 F.2d 582, 584 (2d Cir.1950). However, where, as here, affiliated companies have provided services to the Debtor prior to the transfer for which they have still not been paid, they may provide the claims which [the Defendant] posits are necessary to support the complaint. Perhaps these claims are not bona fide or are subject to equitable subordination. However, the mere existence of an insider relationship is not a sufficient basis to warrant equitable subordination of their claims; an insider creditor must have actually used its power to its own advantage or to another creditor's detriment. *Braas Sys., Inc. v. WMR Partners (In re Octagon Roofing),* 157 B.R. 852, 857 (N.D.Ill.1993); *see also HBE Leasing Corp. v. Frank,* 48 F.3d 623, 634–35 (2d Cir.1995); *Goldstein v. Wolfson,* 132 F.2d 624, 626 (2d Cir.1943). And, in any event, even a subordinated claim may be sufficient grounding for a fraudulent transfer complaint; however, I need not and do not reach that issue.

While FIRST's conduct may have been culpable, it does not disqualify it as a creditor for purposes of the bringing of an action to avoid a fraudulent transfer.

Accordingly, the TRUSTEE's motion for partial summary judgment on Count II of the complaint is allowed. The only remaining issue with respect to Count II is whether KZK was insolvent when the transfer to PCA

---

9. Count III is under § 160/5(a)(1) and Count IV is under § 160/5(a)(2), of the Uniform Fraudulent Conveyance Act as adopted by the State of Illinois, 740 ILCS § 160/5(a)(1) and (2). Sections 160/5(a)(1) and (2) read as follows:

§ 5. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before

or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation....

was made. The motion for summary judgment filed by PCA is denied.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.