**IN RE: DBSI, INC., et al., Debtors.**

**James R. Zazalli, Plaintiff,**

**v.**

**Douglas L. Swenson, et al., Defendants.**

**Case No. 1:13-CV-86-S-MJP**

United States District Court, D. Idaho.

Signed May 16, 2016

Brett S. Theisen, Jennifer A. Hradil, Mark Barry Conlan, Michael F. Quinn, Gibbons P.C., Newark, NJ, Keely E. Duke, Kevin Alan Griffiths, Duke Scanlan & Hall, PLLC, Boise, ID, for Plaintiff.

Ari David Kunofsky, Kieran O'Neall Carter, U.S. Department of Justice Tax Division, for Defendants.

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Marsha J. Pechman, United States District Judge for the Western District of Washington Sitting by Special Designation

The above-entitled Court, having received and reviewed

1. United States of America's Renewed Motion for Summary Judgment (Dkt. No. 192), Trustee's Brief in Opposition to United States of America's Renewed Motion for Summary Judgment (Dkt. No. 192), and Reply Brief in Support of United States of America's Renewed Motion for Summary Judgment (Dkt. No. 210);

2. Trustee's Motion for Summary Judgment (Dkt. No. 194), Response to Trustee's Motion for Summary Judgment (Dkt. No. 204), and Trustee's Reply Brief in Support of Motion for Summary Judgment (Dkt. No. 211);

all attached declarations and exhibits and relevant portions of the record, rules as follows:

IT IS ORDERED that the United States' motion for summary judgment is DENIED IN PART and GRANTED IN PART. The motion is granted to the extent that the Trustee may not recover the $3.6 million refunded to the taxpayer-members; the remainder of the motion is denied.

IT IS ORDERED that the Trustee's motion for summary judgment is GRANTED.

### Background

The parties are well aware of the facts and the Court will not reiterate them at length. At issue here are moneys transferred by an LLC (FOR1031) to satisfy the tax liabilities of its owner-members. The Trustee in bankruptcy seeks to avoid those transfers; the Government believes that it is entitled to retain them. The Court reproduces here (1) excerpts from Douglas Swenson's Presentence Investigation Report and (2) a list of undisputed facts relevant to the determination of these motions.

From Douglas Swenson's Pre-Sentence Report:

DBSI Securities, a DBSI-related entity, sold TIC [*tenant-in-common*] investments as securities. FOR1031, also a DBSI-related entity, sold TIC investments as real estate. FOR1031 sold investments directly to property owners which essentially allowed an individual to sell his investment property, transfer the funds to DBSI to purchase a TIC interest, and received fixed payments under the Master Lease. DBSI was one of the few companies that sold TIC investments in this manner as it believed TIC investments were not required to be sold as securities. Ultimately, the SEC disagreed... (CR 13-91 BLW, Dkt. No. 648, ¶ 43.)

Investigators testified that DBSI's misrepresentations to investors date back to at least 2004. In April of 2005, DBSI (through FOR1031) made a $14,115,000 payment to the Internal Revenue Service on Douglas L. Swenson's behalf for taxes he owed. According to the government, these funds contained the proceeds of fraud. (Id. at ¶ 78.)

From the Trustee's Statement of Undisputed Facts:

¶ 20. The IRS has admitted that all of the Transfers... were made by the Debtors with the actual intent to hinder, delay, and/or defraud present or future creditors of the Debtors.

¶ 22. None of the transferors [*including FOR1031*]... made any IRS Transfer on account of its own federal tax liability.

¶ 32. FOR1031 was never taxed as a C corporation, and at no time was

FOR1031 subject to federal income tax at the entity level.

Dkt. No. 194–2. The Internal Revenue Service ("IRS") conceded, in its response to this document, that it did not dispute these facts. (Dkt. No. 204–1.)

## Discussion

In the face of the Government's concession that the funds paid to the IRS by FOR1031 were fraudulent transfers (Dkt. No. 204–1 at ¶ 20), the Trustee is entitled to avoid any transfer made within four years of filing the bankruptcy petition. (11 U.S.C. §§ 548(a)(1)(A), 544(b); Idaho Code § 55–913(1)(a).) The Government may retain a lien on the IRS transfers made within two years of the bankruptcy petition if it can prove that it received the transfers (1) in good faith and (2) for value (11 U.S.C. § 548(c)); transfers made between two and four years before the bankruptcy petition are not avoidable upon proof that the IRS "took [them] in good faith and for reasonably equivalent value." (Idaho Code § 55–917(1).)

The common elements of the defense which the Government must establish are: (1) whether the transfers were made for reasonably equivalent value and (2) whether the transferee (the IRS) received the transfers in good faith. The cross-motions for summary judgment represent the attempts by both sides to establish as a matter of law that the Government either can or cannot prove the elements of this affirmative defense. As explained below, the Court finds that (as to the vast majority of the funds) the Trustee succeeds where the Government does not.

The remainder of this order will analyze (1) the Government's alternate theories of "value," (2) the issue of "good faith" and (3) whether the Trustee should be allowed to recoup the refunded portion of the tax payments from the IRS.

## I. Were the transfers made for reasonably equivalent value?

As regards the "reasonably equivalent value" ("REV") element, both sides agree that the test is the effect of the transfer on the bankruptcy estate from the perspective of the unsecured creditors; i.e., were the unsecured creditors better or worse off after the transaction? (*See* Frontier Bank v. Brown (In re N. Merch., Inc.), 371 F.3d 1056, 1059 (9th Cir.2004)("[A court's] primary focus is on the net effect of the transaction on the debtor's estate and funds available to the unsecured creditors.") The Government presents three alternate theories by which it argues that the transfers were received for "value;" i.e., that the unsecured creditors somehow benefitted from tax distributions.

### A. *"Entity" theory*

The crux of this argument is that the owners of FOR1031 (created as a limited liability company ["LLC"], which by law are "pass-through" entities for tax purposes) could have elected C corporation status, which would have rendered the company directly liable for its income taxes. Instead, they chose S corporation status (in which the members have personal tax liability for the business's income). The Government's position is that, as a C corporation, FOR1031 would have paid $20 million in taxes on its declared income, while as an S corporation it paid only $17 million. The $3 million difference, according to this theory, is a savings which represents "value" to the debtor entity.

The Court finds this argument unsupportable for three reasons. First, as indicated *supra*, "at no time was FOR1031 subject to federal income tax at the entity level." (Dkt. No. 194–2, ¶ 32.) Given that fact, the entity FOR1031 realized no "savings" because it owed no taxes (the owners

did)[1]; the cases cited by the Government[2] are distinguishable on the grounds that the businesses in those cases were already corporations subject to taxes and thus accrued a concrete benefit by electing a different taxable status.

Second, the argument that the entity *could have* chosen a legal status which would have subjected it to direct tax liability is speculative and meaningless. The fact is that FOR1031 did not chose C corporation status and its decision not to choose it cannot create "value" in any meaningful sense.

Third, given that the transfers were fraudulent, "made by the Debtors with the actual intent to hinder, delay, and/or defraud present or future creditors of the Debtors" (Id. at ¶ 20), the transaction could not possibly leave the unsecured creditors better off than had the taxes been paid based on a different legal status. Viewed from the perspective of the unsecured creditors, the money should never have been transferred to the IRS, it should have been returned to the investors, and the allegation that (speculatively) more *could have* been given than actually was does not equate to the legal definition of "value" as announced in In re Northern Merch., Inc., *supra*.

### B. *"Contingent liability" theory*

This theory argues that the satisfaction of FOR1031's obligation to pay the tax liabilities of its members constituted "value." The Government cites to the Amended Operating Agreement ("AOA") under which FOR1031 was authorized to make distributions of estimated taxes "to the Members and Assignees" (Dkt. No. 193–7, Gov. Ex. 106, § 7.3.7); and Ninth Circuit case law holding that an entity's repayment of a loan which the owners had taken out constituted "value" for the company. (In re Northern Merch., Inc., *supra*, at 1058.)

The argument fails to persuade. It is not at all clear to the Court that the LLC had any "obligation" to make a tax distribution directly to the IRS under the AOA. § 7.3.7 of the agreement states

> If the cash position of the Company is sufficient to allow a distribution of the amount of such estimated taxes, then the Company shall distribute, no later than April 15th, to the Members and Assignees such amount in proportion to their Units.

AOA, Gov. Ex. 106 at 11. First, FOR1031 was only "obligated" to make a distribution to "Members and Assignees." The IRS was not a "member" of the company and a thorough reading of the AOA reveals that (as regards assignments by an individual) only a spouse, child or grandchild can be an "Assignee." (Id. at 20, § 13.4.1.) Any obligation represented by the AOA had nothing to do with the IRS and a direct distribution to that agency was not even authorized under the agreement.

Second, FOR1031 was only required to make a distribution to a Member or Assignee "if the cash position of the Company [was] sufficient to allow a distribution." Since the Government has conceded that

---

1. Any "property" that a[n entity] would have enjoyed regardless of the... [t]ransaction cannot be regarded as property received "in exchange for" the transfer or obligation. Duplication Mgmt. v. Countrywide Home Loans, Inc., 501 B.R. 462, 484 (Bankr.D.Mass.2013). Conversely, any property that an entity would not have enjoyed regardless of the transaction cannot attain the status of "value attained." The Debtor here had no tax liability to be increased or decreased.

2. Gold v. United States (In re Kenrob Infor. Tech. Sols., Inc.), 474 B.R. 799 (E.D.Va. 2012); Crumpton v. Stephens (In re Northlake Foods), 715 F.3d 1251 (11th Cir.2013).

the transfer of the funds was fraudulent, the Government fails to explain how the cash position of the Company was "sufficient to allow a distribution." The money held by the Company was the product of fraud which rightfully belonged to the defrauded investors, not to the IRS, and the Company was not in a legal position to permit the distribution of its assets elsewhere.

Third, under Idaho law

A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

> (a) With actual intent to hinder, delay, or defraud any creditor of the debtor.

Idaho Code § 55–913(1). The Government has conceded that the transfers to the IRS were intended to hinder, delay and defraud the creditors of the entity. To the extent that the owners of FOR1031 could have been considered "creditors" of the entity based on an their right to receive a tax distribution (which the Government argues, based on Idaho law; *see infra*), none of the insiders at DBSI (including Douglas Swenson) could have asserted a valid right to payment against FOR1031; without an enforceable right to payment on their part, the company's distribution to satisfy the Members' tax obligations cannot constitute "value" for the company. The Court agrees with the Trustee's reasoning:

> For purposes of determining whether—from the creditors' perspective—FOR1031 received value because it satisfied "obligations" to make tax distributions to its members, the IRS cannot have any better position than if those members had received distributions directly. Distributions to Swenson could not provide value to FOR1031 when—as

the United States admits—Swenson was using FOR1031 to orchestrate a massive fraud on its investors.

Trustee Reply, Dkt. No. 211 at 6.

The Government cites to Ninth Circuit law which it claims supports its position. *See* In re Northern Merch., Inc., 371 F.3d at 1059. But the case is inapposite—the members of the entity in Northern Merchandise took out the loan for the benefit of the business, so the entity actually received something of value in exchange for its transfer of a security interest to the lending institution. In contrast, FOR1031 received no property or tangible value for the IRS transfers, nor was the transfer it made to the IRS for the Company's benefit.

The Government tries to characterize the member-owners of FOR1031 as "creditors" under Idaho law, citing a statute which stated

> At the time a member becomes entitled to receive a distribution, the member has the status of, and is entitled to all remedies available to, a creditor of the limited liability company with respect to the distribution.

1993 Ida. ALS 224, 1993 Idaho Sess. Laws 224, 1993 Ida. Ch. 224, 1993 Ida. HB 381. But the IRS cites no case law putting LLC members on a par with other creditors, whereas the Trustee cites cases from jurisdictions with similar statutes which hold that, unless the distributions are made for salary or services rendered, they are not made in exchange for REV. Fisher v. Hamilton (In re Teknek, LLC), 343 B.R. 850, 861 (Bankr.N.D.Ill.2006); In re Brentwood–Lexford Partners, LLC, 292 B.R. 255, 267–68 (Bankr.N.D.Tex.2003). This is especially true where the entity's funds represent the proceeds of a fraudulent Ponzi scheme such as the one here. Elite Personnel, Inc. v. Barclay (In re AFI

Holding, Inc.), 2006 WL 6810954, at *5, 2006 Bankr. LEXIS 4793, at *18 (9th Cir. BAP Oct. 16, 2006) ("[T]he controlling case law establishes that a distribution to a limited partner, which is an equity security holder, in the context of a Ponzi scheme, cannot be for reasonably equivalent value...")

Idaho LLC law concerns itself with the owners' "entitlement" to receive distributions. Idaho Code §§ 53–629, 53–632. The Government's argument ignores the fact that, under the Uniform Fraudulent Transfer Act, the distributions were invalid; i.e., the owner-members were not "entitled" to receive anything. Defendant also ignores § 53–668(2) of the Idaho Code: "Unless displaced by particular provisions of this chapter, the principles of law *and equity* supplement the provisions of this chapter." (emphasis supplied).

This Court's decision is very much driven by equitable considerations which must have a place in any analysis concerning the disposition of fraudulent transfers. Every legal theory offered by the Government to defend its right to retain this transfer seems to ignore the fact that the money at issue here is the proceeds of a widespread and devastating fraudulent scheme, stolen from scores of investors. The IRS discusses FOR1031 as if it was just another business instead of a vehicle for bilking investors, and the tax distribution as just another obligation of a legitimate enterprise instead of a money-laundering scheme for a cartel of con artists. This Court finds that equity demands the Government not be permitted to keep this money.

### C. *"Reverse alter ego" theory*

The Government seeks to treat the funds of FOR1031 as if they were the personal assets of Swenson, a "reverse veil piercing" which it justifies on the grounds that the Trustee has previously argued for alter ego treatment of the DBSI insiders' business entities.

The Government treats the "alter ego" concept as though it were a mathematical equation; i.e., if A = B, then B = A. It is not that simple. "Reverse piercing of the corporate veil is a 'rarity,' and it is rarer yet in bankruptcy." Barber v. Production Credit Servs. (In re KZK Livestock), 221 B.R. 471, 478 (Bankr.C.D.Ill. 1998). That same case also stands for the principle that the alter ego doctrine should not be utilized where it "would produce an unfair result." Id. at 479. The Trustee utilized the alter ego doctrine to get at the assets of DBSI business entities for the benefit of defrauded investor-creditors. The Government is attempting to use a "reverse alter ego" theory to benefit the IRS at the expense of defrauded investor-creditors. It would be an unfair result and the defense will be rejected.

### II. Were the transfers received "in good faith"?

The Government must establish both prongs of its affirmative defense in order to retain its lien on the transferred funds. Having failed to convince the Court that the transfers were received for value, the defense fails. For the sake of completeness (and knowing this case will be the subject of an appeal), the Court addresses the three arguments intended to establish that the Government received the FOR1031 transfers in good faith.

### A. *Presumption of good faith* [3]

Defendant seeks summary judgment on the issue of whether it acted in

---

**3.** In their briefing on the Government's summary judgment motion, the parties argue

good faith in accepting the tax transfer from FOR1031. The Government argues that it is "presumed" to act in good faith when executing the laws. *See* Road & Highway Builders, LLC v. United States, 102 Fed.Cl. 88, 92 ((Fed.Cl.2011) ("As a general proposition, 'government officials are presumed to act in good faith;'" *citations omitted.*)

■ But the Government commits a logical fallacy in its attempt to justify the acceptance of the FOR1031 tax transfers. Defendant cites to 26 U.S.C. § 6311 concerning the acceptance of payments:

> **Authority to receive.** It shall be lawful for the Secretary to receive for internal revenue taxes (or in payment for internal revenue stamps) any commercially acceptable means that the Secretary deems appropriate to the extent and under the conditions provided in regulations prescribed by the Secretary.

On the basis of this statute, the Government contends that "[t]he United States accepted the payments here within the bounds of its statutes and regulations... Accordingly, the United States acted in good faith." (Gov. Mtn, Dkt. No. 192–1 at 11.) But simply because the Government cannot be said to have acted unlawfully in accepting payment in a "commercially acceptable" form does not mean that every payment made in a commercially acceptable form is lawful; i.e., just because a party's taxes were paid by commercially acceptable means does not automatically insure the payment was lawful in every

regard. That FOR1031 may have utilized a commercially acceptable form of payment in the tax transfers only means that the IRS did not violate that particular regulation in accepting them; it does not follow logically or legally that it therefore committed no violation at all, or should not have been on the lookout for some other form of improper conduct. The Court agrees with the Trustee in this regard:

> The IRS' policies are expressly designed to facilitate the deposit of as much money as possible in the shortest amount of time. [SOF, ¶ 43] The IRS is free to adopt and implement policies with this goal, but may not use such procedures to exempt itself from liability as the recipient of a fraudulent transfer.

Trustee Reply, Dkt. No. 205 at 11.

■ The Government contends that the Supreme Court has held that "nonbankruptcy presumptions should apply unless Congress expressly provides otherwise" (Reply, Dkt. No. 210 at 6); i.e., it should be entitled to its "presumption of good faith" even in a bankruptcy action.[4] The Government has failed to convince this Court that the IRS is entitled to a presumption of good faith merely because it followed the regulation requiring it to process "commercially acceptable" payments. The legal reality of fraudulent transfers is that they put certain burdens on the accepting party, burdens which cannot be erased by a "presumption" of good faith.

---

back and forth concerning which side has the burden of proving that the IRS did or did not receive the transfers in good faith. It is the subject of an entirely separate motion in limine (Dkt. No. 212) and the Court will reserve analysis of that issue for the motion in limine, should that become necessary.

**4.** The case the Government cites for this proposition (Raleigh v. Ill. Dep't of Revenue, 530

U.S. 15, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000)) does not say that "all presumptions apply;" rather it holds: "Congress of course may do what it likes with entitlements in bankruptcy, but there is no sign that Congress meant to alter the burdens of production and persuasion on tax claims." Id. at 21, 120 S.Ct. 1951.

The recipients of fraudulent transfers are subject to an "objective inquiry" standard of good faith. The relevant inquiry is what the transferee "objectively knew or should have known instead of examining the transferee's actual knowledge from a subjective standpoint." *(citations omitted.)* Quilling v. Stark, No. 3–05–CV–1976–BD, 2007 WL 415351, at *3, 2007 U.S. Dist. LEXIS 8695, at *11 (N.D.Tex. Feb. 7, 2007). A test exists for determining the existence of "good faith:"

> The Bankruptcy Court correctly noted that the good faith question can be broken down into two parts: (1) whether [transferee] was on inquiry notice of the [transferor's] fraud and (2) whether [transferee] was diligent in its investigation of the [transferor]. *See In re Manhattan [Inv.] Fund [Ltd.],* 359 B.R. [510] at 524–25 [ (Bankr.S.D.N.Y.2007) ] (citing *Hayes v. Palm Seedlings Partners (In re Agric. Research and Tech. Group, Inc.),* 916 F.2d 528, 535–36 (9th Cir. 1990)). An objective standard applies to both questions.

Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.), 397 B.R. 1, 22–23 (S.D.N.Y.2007).

While the Government maintains that it would be burdensome to make inquiries every time a third party payment was received, the Trustee cites a number of facts which could/should have served to put the agency on "inquiry notice:"

1. The $14+ million check

2. Payment on behalf of a party (Swenson) who was not even a member of FOR1031 during 2004

3. Payment on behalf of a party the majority of whose income was not attributable to activity of FOR1031

4. That FOR1031 was a startup company with $500 million in revenue and $50 million in ordinary business income in its first year.

These alone create a sufficiently disputed factual issue that summary judgment is inappropriate. Furthermore, the questions of whether a "diligent" inquiry was conducted in the face of these facts and whether that inquiry would have uncovered the insolvency and fraud underlying these transfers are fact-intensive questions that are likewise not amenable to summary judgment. For these reasons, the Government's motion for summary judgment on the issue of good faith is denied.

### III. Was IRS "mere conduit" for refunded portion of tax transfers?

Approximately $3.6 million of the transfers were refunded to the members of FOR1031 as tax overpayments. The Government argues that, because it was legally obligated to refund the tax overpayments, it was a "conduit" not a "transferee" as regards that portion of the funds. The law requires the IRS to refund the tax overpayment to the taxpayer (26 U.S.C. §§ 6402(a), 6511), thus the agency cannot be said to have exercised the "dominion" over the funds necessary to qualify it as a "transferee" concerning this portion of the funds. (*See* In re Viola, 583 Fed.Appx. 669, 670 (9th Cir.2014.)

The Trustee counters that the "mere conduit" defense is not contained in the Bankruptcy Code and that recent Supreme Court rulings disallow its application in this context. Citing to Law v. Siegel, —— U.S. ——, 134 S.Ct. 1188, 188 L.Ed.2d 146 (2014), Plaintiff argues that the Court is not permitted to create exceptions not already enumerated in the Bankruptcy Code (*see* id. at 1196–97) and the "conduit" defense is not a bankruptcy-created doctrine (intended rather for "financial intermediaries"—title companies, escrow agents, etc.—who hold transferred funds for a purpose as a contractual duty).

But, as the Government points out, the "mere conduit" defense is not prohibited by the Bankruptcy Code and the Ninth Circuit has utilized the "dominion" test in Viola, a bankruptcy case decided in the wake of the Law v. Siegel opinion. The Court adopts the rationale cited in favor of the defense in an Eleventh Circuit case:

[M]ere conduits—like banks receiving deposits or the IRS here—receive only the benefits that accrue between the moment the funds are received and the moment they are returned. Thus, granting the IRS mere conduit status furthers the goals of bankruptcy by forcing [a trustee] to recover voidable transfers only from those parties who should rightfully be involved in the bankruptcy proceedings.

In re Menotte, 745 F.3d 1342, 1352–53 (11th Cir.2014). See also In re Regency Int'l, 2010 WL 4053982, at *7 (W.D.Mich. Oct. 14, 2010)("Congress did not intend to require the IRS to disgorge the amount of the payment twice, i.e., once to the taxpayer as a refund, and once to the Trustee.")

Summary judgment will be granted to the Government on the issue of that portion of the transfer already refunded to the taxpayers.

### Conclusion

The Government is not entitled to summary judgment on the issue of whether the tax distributions paid out by FOR1031 were received in good faith; that portion of its motion is denied. The Trustee has established, as a matter of law, that the fraudulent transfers at issue in this litigation were not received "for value;" Plaintiff's summary judgment in that regard will be granted (and the Government's companion motion denied), with the result that the Government's affirmative defense fails. The Government will be required to return the funds received as tax payments from FOR1031, except as to that amount

already paid out as refunds; the Government's summary motion is granted to that extent.

The clerk is ordered to provide copies of this order to all counsel.